Susan BASCH and Jonathan David Basch, a minor by his mother and next friend Susan Basch and Rachel Elizabeth Basch, a minor by her mother and next friend Susan Basch and Benjamin Ari Basch, a minor by his mother and next friend Susan Basch and Estate of Philip Basch, Susan Basch, Personal Representative, Appellants,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Appellee.

Susan BASCH and Jonathan David Basch, a minor by his mother and next friend Susan Basch and Rachel Elizabeth Basch, a minor by her mother and next friend Susan Basch and Benjamin Ari Basch, a minor by his mother and next friend Susan Basch and Estate of Philip Basch, Susan Basch, Personal Representative, Plaintiffs,

v.

WESTINGHOUSE ELECTRIC CORPORATION, Appellee.

In re Jerome J. SEIDENMAN and Seidenman & Weiss, P.A., Appellants.

Nos. 84–1821, 83–2149.

United States Court of Appeals, Fourth Circuit.

Argued June 4, 1985.

Decided Nov. 12, 1985.

Irwin E. Weiss (William L. Helfand, Jerome J. Seidenman, Seidenman & Weiss, P.A., Baltimore, Md., on brief), for appellants in No. 84–1821.

Donald E. Sharpe (C. Lamar Garren, Piper & Marbury, Baltimore, Md., on brief), for appellee in No. 84–1821.

James A. Eichner (Beale, Eichner, Wright, Denton & Balfour, P.C., Richmond, Va., on brief), for appellant in No. 83–2149.

C. Lamar Garren (Donald E. Sharpe, Piper & Marbury, Baltimore, Md., on brief), for appellee in No. 83–2149.

Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and GORDON, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

MURNAGHAN, Circuit Judge:

I

The instant appeal arises out of an action commenced by Susan Basch, her children, and the estate of her deceased husband, Philip Basch. At the time of his death, Mr. Basch worked for Westinghouse Electric Corporation in Iran. He became ill and was treated by an Iranian doctor who had been retained and recommended by Westinghouse. Plaintiffs seek to hold Westinghouse liable for the allegedly inadequate medical care that caused the death of Mr. Basch.

II

On July 17, 1975 Mr. Basch returned to Westinghouse to accept a new position with the company in Shiraz, Iran. Before leaving the United States, the Basch family participated in an orientation program for Iranian-bound Westinghouse employees. At the program they received a general information booklet about Shiraz and were advised that "adequate" medical attention would be available from physicians who had been trained in the United States and Europe. Although the booklet contained names and numbers of various doctors, the publication stated that Westinghouse "was not endorsing or recommending" the listed professionals. Mrs. Basch stated in an affidavit, however, that she had been told by a Westinghouse official that a "capable company physician" had been employed in Shiraz.

On November 1, 1975, a few months after the Basches arrived in Iran, a memorandum was sent to the Westinghouse employees informing them that the company had a contract with Dr. Salami.[1] The

---

1. The memo provided:

Dr. Salami will provide Westinghouse employees and families medical service and advice on a 24 hour, 7-day-a-week basis. In the event Dr. Salami is unavailable for any reason, it will be his responsibility to designate another doctor equally qualified.

The Doctor will have an English speaking nurse, Miss D. Jesmani, secretary, and receptionist for handling appointments and messages at his office and at the out-patient clinic of Nemazee Hospital.

The Doctor will fill out insurance forms for employees when acting as the Employee Medical Doctor. These forms should be turned in by the employee to the Westinghouse office in Shiraz to be forwarded. All medical bills must be paid by the employee. The employee then will be reimbursed by the insurance carrier.

Dr. Salami will be able to give you and your family the required vaccination and immunization shots, so bring in your shot card for review.

Medical treatment by Dr. Salami as required—when other than routine physical (does not include Lab or X-ray) will be filed separately for all expenses incurred.

If you or your family have an emergency hospitalization, you should call Dr. Salami and he will call ahead to assist in your admittance to Nemazee Hospital and will follow up on your treatment there.

Dr. Salami comes to us highly recommended, and has received his entire medical schooling and internship in USA. He is a very qualified internist and has only recently returned (18 months) to Iran.

We feel by having Dr. Salami available you will be able to have many of your medical questions answered. He will also be able to assist you in obtaining appointments with other medical specialists you may need.

It is not recommended to wait till (sic) an emergency take (sic) place to contact Doctor Salami but become aquainted (sic) now so he can have at least a medical record of you and your family when needed.

agreement between Westinghouse and Dr. Salami provided that he would receive a monthly fee for providing vaccinations, employment related physical examinations and general consulting and referral services and that he would be available to provide any other medical services requested by employees on a twenty-four hour basis. With respect to "non-routine" physicals and medical services, employees were to be billed separately.[2] Mrs. Basch stated in her deposition that she understood (1) there was no obligation to use Dr. Salami and (2) if they used Dr. Salami for "general medical services" they had to pay him directly for his service.

On February 1, 1977 Mr. Basch developed a respiratory problem. He visited Dr. Salami on February 3 and received a prescription. On February 5 Mr. Basch, who was not improving, returned to Dr. Salami for an x-ray and additional medication. On February 6 Mr. Basch decided not to continue his treatment with Dr. Salami and, upon the advice of a visiting American physician, visited another doctor and was admitted to Hafez hospital.

Mr. Basch continued to deteriorate. On February 10, 1977 Mrs. Basch sought the assistance of Westinghouse in an attempt to transfer her husband to an American military hospital in Tehran. She also sought to have a doctor fly in from Tehran. In response, Westinghouse told Mrs. Basch that the American military hospital would not accept civilians and that a doctor from Tehran would only be able to supervise Mr. Basch's case for one day. The company instead offered to have Dr. Salami come to the Hafez hospital or to transfer Mr. Basch to another hospital. The Basches declined both offers.

By February 11, 1977, Mr. Basch was too ill to travel. He died on February 13, 1977.

Plaintiffs filed the present action on February 10, 1980, alleging that Westinghouse was liable for the asserted negligence of Dr. Salami and Hafez Hospital. In Counts I and II of the complaint, plaintiffs alleged

> Westinghouse Employees and dependents have no obligation to use this Doctor or any doctor the employee is referred to by Dr. Salami.
> Appointments are necessary and anything other than emergency it is advisable to call ahead. Children under 12 years will be referred to a pediatrician.
> We will need yours and your family's names and blood type. We need this information to furnish Dr. Salami and our office. Turn in this information to our Westinghouse Shiraz Office. For any questions regarding Dr. Salami or blood type contact Bob Haisley.

**2.** The contract provided:
> EMPLOYEE AND DEPENDENT
> A. Vaccinations
> 1. Vaccinations will be given to all Westinghouse ... employees and their dependents, in compliance with their requirements and World Health Organisation (sic) regulations.
> 2. Vaccinations of personnel and families when local health conditions indicate that such a protection is needed.
> 3. Routine vaccinations and immunisations (sic) that will be available are:
>   Cholera
>   Typhoid, paratyphoid
>   Polio
>   Diphteria (sic)
>   Tetanus
>   Smallpox
>   Gamma Globulin for infectious hepatitis
> 4. Medical examinations for pre-employment, check ups and consultancy (sic) purposes.
> 5. Medical treatment as required—when other than routine physicals the employees will be billed separately for all expenses incurred.
> 6. Referral services to other physicians.
> 7. Other related medical services.
> In the event Dr. Salimi (sic) is unavailable for any reason it will be his responsibility to designate another doctor equally qualified to fill in for him. The doctor will be available to provide medical services on a 24 hour basis 7 days a week.
> The doctor will retain the services of an English speaking secretary, receptionist or other employee capable of handling routine appointments and messages etc.
> The doctor will have a telephone in the office and home and the numbers will be made available to all employees.
> The doctor will fill out insurance forms for employees and or their dependents without additional charge to the company or to the employees when acting as the employees['] medical advisor.
> ....
> Westinghouse shall [not] direct [its] employees or their dependents to utlise (sic) the services of the Doctor for any other reasons than are included in this Agreement.

causes of action for wrongful death and negligence. In Count III plaintiffs asserted that Westinghouse was in breach of a contractual obligation to supply adequate and proper medical care to Mr. Basch.

After the complaint was filed, Westinghouse moved, pursuant to Federal Rule of Civil Procedure 44.1, for a determination of the applicability of foreign law. The district court granted the motion, ruling that Iranian law governed all causes of action. Westinghouse then sought a dismissal of the complaint. The district court granted the motion in part, holding that Westinghouse could not be held liable for the alleged negligence of the hospital.

The court did not dismiss the allegations concerning the defendant's responsibility under Iranian law for Dr. Salami's alleged negligence. At a pretrial conference, the parties were asked to submit memoranda concerning Iranian law. Both sides retained experts who analyzed the issues pending before the court. On June 25, 1984, the district judge entered summary judgment in favor of Westinghouse on the causes of action in tort.[3] With respect to the contract claim, the court granted only partial judgment for Westinghouse. For purposes of summary judgment, the court held that the record was insufficiently developed to determine a) whether there was a contract to provide adequate medical care or b) whether Westinghouse was in breach of the contract. The district court granted summary judgment on the question of damages under Iranian law of contracts, ruling that loss of profits and consequential damages were not recoverable.

Thereafter, the district court granted plaintiffs' motion for entry of final judgment and certified the appeal pursuant to 28 U.S.C. § 1292(b).[4]

### III

▮ The first issue on appeal is whether there is any theory of Iranian law under which Westinghouse could be held liable in tort for the alleged negligence of Dr. Salami.[5]

The parties agree that the principal basis for a claim imposing tort liability on Westinghouse is Article 12 of the Civil Responsibility Law of Iran ("CRLI"). Under Article 12 an employer may be held vicariously liable for the tortious actions of its employees which occur in the course of employment. The uncontested translation provides that "Employers ... are responsible for the compensation of damages caused by their white-collar and/or blue-collar workers in the course of duty or as a result thereof...." Article 12 defines "employer" and "worker" by reference to Iran's Labor Law of 1965. Article 1 of the Labor Law defines "worker" as "an individual who works in any capacity under the instruction of an employer against the payment of salary and wages." "Employer," defined in Article 3, is one "under whose instruction and for whose account a worker works." Thus, as the district court reasoned, the Article 12 inquiry is whether there was an employer-employee relationship between Westinghouse and Dr. Salami, *i.e.*, one where Westinghouse instructed

---

**3.** Following a March 19, 1984 hearing on the question of Iranian law, the district court ruled from the bench in favor of defendants. On March 21, 1984, at plaintiffs' request, the court agreed to reconsider its rulings and invited full briefing on the issues. On June 25, 1984 the district court issued a written memorandum opinion in which it adhered to its original ruling.

**4.** It appeared evident to the plaintiffs that, if damages were limited so as not to include loss

of profits and consequential damages, the game was not worth the litigation candle.

**5.** Pursuant to Rule 44.1 the district court considered submissions from the Iranian lawyers retained by plaintiffs and defendant and determined that Iranian law did not support plaintiffs' two negligence causes of action. A determination concerning the law of a foreign country is a ruling on a question of law and is freely reviewable on appeal. *See United States v. First National Bank of Chicago,* 699 F.2d 341, 344 (7th

Dr. Salami in the carrying out of his duties.[6]

■ Both experts, in their initial submissions to the district court, agreed that Westinghouse and Dr. Salami were not in an employer-employee relationship within the meaning of the Iranian Labor Laws. Westinghouse's expert, Mr. Mahmoud Katirai, concluded that Dr. Salami did not work "under the instruction" or "for the account of" Westinghouse, but simply was an independent contractor.[7] Plaintiffs' expert, Mr. Bahman Lotfi, also concluded that Dr. Salami was an independent contractor because (1) he did not work exclusively for the defendant and (2) the doctor's office was not the employer's "workplace." [8]

The undisputed facts support the experts' conclusion that Dr. Salami was not an employee of Westinghouse. Dr. Salami was retained by Westinghouse on a contractual basis to provide certain employment-related medical services—vaccinations and physicals. By contract he also was available to provide general medical treatment on a twenty-four hour basis. However, unlike the listed services, which were covered by the monthly retainer fee, "medical treatment as required" was billed to the Westinghouse employee separately. Thus, although Dr. Salami was "on-call" twenty-four hours a day, Dr. Salami's treatment of Mr. Basch for pneumonia undisputedly was outside the scope of the medical services contract; his services were based on a "separate agreement" between Mr. Basch and Dr. Salami.

Plaintiffs argue that certain terms of the contract support the inference that Dr. Salami was "controlled" by Westinghouse. The inference, however, is not probative of employee status for every independent contractor is "controlled" by the terms of the contract. Here, Westinghouse—for the convenience of its employees—purchased the right to have an English-speaking doctor available on a twenty-four hour basis. Moreover, the company made it clear in the November 1, 1975 memorandum that Westinghouse employees had no obligation to use Dr. Salami.

Plaintiffs further argue that a jury could find that Dr. Salami's office was part of the workplace of Westinghouse as defined by Article 5 of the Labor Act.[9] The argument, as the district judge concluded, really begs the question in that "workplace" is defined as "a place where a workman works under the instructions of an employer." As noted above, Dr. Salami, when treating Mr. Basch for pneumonia, was acting outside the scope of the medical services agreement and was treating him as a private patient in his own office. He was not, in any sense, acting "under the instruction" of Westinghouse. Consequent-

---

Cir.1983). *See generally* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2446 (1971).

6. No argument is made that Article 12 extends liability to Mr. Basch as an employee injured in the course of duty.

7. Mr. Katirai, quoting from a leading treatise on Iranian Labor Law, explained that the phrase "under the instruction" requires that "the employer not only determines what task is to be performed, but controls the manner or procedure by which it is done." The key element is the employer's ability to supervise or control. According to Mr. Katirai the element of control is normally absent in a retainer fee arrangement with a physician.

8. Mr. Lotfi concluded:

Although pursuant to a contract Dr. Salami performed a number of specified tasks for the Defendant, I still do not believe he could be classified as an "employee" subject of Article 1 of the Labor Act.... Under the circumstances Dr. Salami will be considered an independent contractor or an agent of the Defendant rendering specific services on a fixed fee basis.

Subsequent to the district court's initial March 19, 1984 decision to dismiss Counts I and II and its decision to reconsider the issues after full briefing, plaintiffs went back to Mr. Lotfi for a second opinion. In a March 28, 1984 memorandum, Mr. Lotfi, perhaps not surprisingly, changed his mind and came to the conclusion that Dr. Salami *was* an employee. Although Lotfi explained that his change of heart was based on the submission of "additional" facts, his first opinion appears to us to have somewhat more probative value.

9. Article 5 of the Labor Act of Iran defines workplace as "a place where a workman works under the instructions of an employer."

ly, we affirm the ruling that Westinghouse is not liable under Article 12 of the CRLI.

Plaintiffs advance two alternative theories of liability: implied agency and negligent hiring.

■ Plainitffs candidly admit that there is nothing in the CRLI which discusses the law of implied agency. They point, however, to Article 3 of the Civil Procedure Code of Iran which states that "where the existing laws of the country are not perfect or are not explicit ... or there does not exist" an applicable law, Iranian courts are "bound to settle the case in accordance with the spirit ... of existing laws, and established usages." Because the CRLI is silent on implied agency, plaintiffs argue that Article 3 of the Civil Procedure Code authorizes the court to look to other sources, including the Civil Code of Iran. Article 658 of the Civil Code, say plaintiffs, clearly recognizes the concept of implied agency. Thus, because there are facts which would support a jury finding of implied agency, plaintiffs contend that summary judgment should not have been granted.

The unstated premise of plaintiffs' argument—that Iranian law is silent on the question of the principal's tort liability for the acts of his agent—is fallacious. Defendant's legal expert points out that the Iranian notion of *respondeat superior* in tort is extremely narrow. He states that the only area where vicarious *tort* liability is recognized is Article 12 of the CRLI, *i.e.,* casting liability on the *employer.* Westinghouse, as we have previously pointed out, was not an employer of Dr. Salami. Otherwise, the prevailing view rejects vicarious tort liability under the Civil Code. Consequently, what plaintiffs call a lacuna is more accurately an express limitation on liability under Iranian law.[10] Indeed, in reaching a contrary conclusion, plaintiffs' expert relied on Dr. Ghaem-Maghami's leading treatise, 1 *Houghough-e-Ta 'ahodat* [Laws of Obligations] 257, 261 (1976). However, defendant's expert, quoting from the very same source, noted that Dr. Ghaem-Maghami has in fact rejected the theory of tort liability under the Civil Code relied upon by plaintiffs' expert.[11]

■ We also conclude that plaintiffs' theory of negligent hiring of an independent contractor is not recognized in Iranian law. The only authority mentioned by plaintiffs is a quote from Dr. Ghaem-Maghami's commentary.[12] The district court properly noted, however, that the quotation relied upon by plaintiffs' experts describes the liability of an employer to third parties for a negligent or wrongful act of an employee.[13] As stated above, there is no employer-employee relationship here. Thus, plaintiffs' argument is inapposite.

10. Mr. Katirai wrote:
   Vicarious liability as created by CRLI is an exception to the general principle of Iranian law that "no one is liable for the actions of another." (Adle, Mustafa, *Hogough-e-Madani* [Treatise on Civil Law] at 140.).... The whole doctrine of vicarious liability as developed in the Anglo-Saxon legal system is foreign to the Islamic system. Thus its introduction through CRLI is to be carefully restricted to the specific situations expressed therein. This conclusion is further supported by the fact that vicarious liability is an exception to the general rule of Iranian law. Therefore, as stated by Dr. Langeroudi and other Iranian scholars, it may not be broadly interpreted to include situations not specified in the exception. Dr. Ghaem-Maghami states: "Such [vicarious] liability is not found in the Civil Code."

11. Furthermore, the liability of a principal under Articles 658 and 674 of the Civil Code is *contractual* and has not been extended to tortious acts. Iranian commentators are unanimous that, under Article 674, principals are only responsible for the acts duly authorized by contract or through subsequent ratification.

12. According to Dr. Ghaem-Maghami:
   Where an employer delegates the management of a task to another, who fails to take such precautions, or where such precautions have been taken, but the observance of such precautions is not proved, the employer will be responsible.
   1· *Houghough-e-Ta 'ahodat* [Laws of Obligations], at 261.

13. The December 28, 1983 submission by plaintiffs' expert made it clear that Dr. Ghaem-Maghami's text was describing an employer's liability for negligent hiring of an employee.

## IV

The district court granted partial summary judgment on Count III on the scope of damages. Relying on defendant's Iranian law expert, the court held that damages for plaintiffs' breach of contract claim are limited to "medical expenses obtained by the employee from other sources as a result of Defendant's breach of an agreement to provide medical services." According to the district court, lost profits (loss of salary) and consequential damages cannot be recovered.

■ We do not agree with the district court's reading of the applicable authorities. Article 728 of the Civil Procedure Code of Iran, which governs the issue of damages for a breach of contract,[14] plainly permits "loss of profits":

> In respect of the foregoing Article the court shall pass a judgment for recovery of damages only in cases where the claimant of indemnity establishes that losses have been inflicted on him as the direct result of non-fulfillment of obligation or delay in the same or non-delivery of the judgment debt. The losses could be the result of loss of property or loss of profits which could have been

derived from the performance of obligation.

Contrary to the district court's opinion, Mr. Katirai's analysis of Article 728 nowhere states that lost profits and consequential damages are absolutely barred in a contract action. Citing several leading commentators, Mr. Katirai instead states that damages for a contract breach are "limited to the damages which are the direct and immediate result" of the breach. These damages, under defendant's own analysis, could include lost profits if directly caused by the breach. As he explained, Article 728 is regularly construed "strictly to exclude loss of profit *when* there is no direct causation between the wrongful act and the damages sustained." (Emphasis added).[15] By implication, if plaintiffs prove that Westinghouse was in breach of an alleged promise to provide adequate medical care under the employment contract, and that the breach caused Mr. Basch to lose wages and benefits under his employment contract, those damages should be recoverable as direct damages under Article 728.[16] Given the present state of the record, we hold that it was premature for the district court to have limited plaintiffs'

**14.** We do not accept plaintiffs' argument that *Article 6* of the CRLI alternatively defines the scope of damages. The CRLI deals with tort damages not contract losses.

**15.** The district court's holding was based, in part, on a statement in Katirai's April 13, 1984 memorandum that the majority of Islamic judicial experts considered lost profits unavailable under Islamic law. Katirai pointed out, however, that Article 728 marked a change in Iranian law. He explained that, *prior* to the enactment of Article 728, Iranian courts did not award any damages on a claim for loss of profits. According to Katirai, with the enactment of the Civil Code, lost profits may be recovered if directly caused by the breach.

**16.** At first blush, Mr. Katirai's March 13, 1984 memorandum supports the district court's limitation on damages. Mr. Katirai explained that, where a corporation was in breach of a promise to provide medical care to its employees, the corporation would be required to reimburse the employee only for the cost of alternative medical treatment. He noted that "an Iranian court

would not hold the corporation liable for any further losses resulting from the breach of a duty to provide medical services *except when medical services are not available in the community.*" (emphasis added). However, because the district court ruled there was a disputed issue of fact on whether there was a promise to provide *adequate* medical care, the opinion given by Katirai is not controlling. Katirai's analysis was based on a situation where (1) the corporation was in breach of a promise to provide medical care and (2) the employee was able to obtain substitute care. Under his analysis, if substitute medical care was not available to the employee, the scope of Westinghouse's liability as the employer of Basch would broaden. Unlike the hypothetical analyzed by defendant's expert, here the alleged contract was to provide *adequate* medical services. Moreover, there is a disputed issue as to whether, because of defendant's breach, Mr. Basch was unable to obtain substitute care. In other words, Westinghouse (1) allegedly undertook to provide adequate care (not simply "medical care") and, as a result of its breach, (2) allegedly prevented Mr. Basch from obtaining alternative treatment.

claim for lost wages.[17] The availability *vel non* of adequate alternative medical services must be determined.

Accordingly, we affirm the district court's dismissal of Counts I and II of the complaint and reverse the district court's grant of summary judgment on the issue of contract damages.

## V

In 83–2149, Jerome J. Seidenman, Esq. and the law firm of Seidenman & Weiss, P.A. ("plaintiffs' counsel") appeal from an order by the district court which imposed sanctions for abusing the discovery process. Since 83–2149 was argued along with the above appeal in 84–1821, we have elected to address the issues in a single opinion.

During the course of Seidenman's representation, a discovery dispute arose over plaintiffs' response to an interrogatory which asked for the names of all of plaintiffs' expert witnesses. On March 14, 1983, an interrogatory answer, signed by plaintiffs' counsel, stated that plaintiffs had not decided on a medical expert, but that a Dr. K.M. Simonton "might" be called. The answer stated that Dr. Simonton had not submitted any reports [18] and explained that the subject of the doctor's testimony would be his observations of plaintiffs' deceased husband and "what was being done for him" while in Iran. The grounds for the doctor's opinion, according to the answer, would be based on "his being a medical doctor and his personal observation of" the decedent.

In anticipation of a May 31, 1983 discovery cutoff and a summer trial date, Westinghouse pressed for a more definitive list of expert witnesses. A motion to compel was filed on March 24, 1983 but later was withdrawn when plaintiffs' counsel agreed to provide supplementation by May 23, 1983. Although or perhaps, more properly, since defendant had not received clarification of Dr. Simonton's exact status—mere fact witness or medical expert on the quality of care—defense counsel, sticking properly to his last, arranged a deposition. On May 17, 1983, a letter to plaintiffs' counsel from Donald E. Sharpe, Esq., the partner at the Baltimore law firm of Piper & Marbury who was acting as defendant's lead trial attorney, revealed that defense counsel had concluded that Dr. Simonton was going to testify as an expert witness. Not having received the promised supplemental answer clarifying Dr. Simonton's status, Mr. Sharpe and an associate conducted a June 2, 1983 deposition of Dr. Simonton in Florida. At the outset of the deposition, defense counsel were surprised by Dr. Simonton's declaration that "I'm a witness of fact without prejudice to either side in this action." But an associate at Seidenman & Weiss, William Helfance, Esq., confirmed Dr. Simonton's assertion, stating that "Dr. Simonton has not been named at any time as an independent expert witness by the plaintiffs or the plaintiffs' attorney." During the course of the deposition plaintiffs objected to a question by defendant which asked for Dr. Simonton's expert opinion on the quality of care given to the decedent in Iran.

Thwarted in their efforts to obtain testimony from Dr. Simonton as an expert, defense counsel returned to Baltimore only to find the delinquent interrogatory an-

17. In remanding, we leave to the district court in the first instance the task of determining the factors which should be taken into account in calculating lost profits attributable to cut off of wages. Should plaintiffs ultimately succeed on the contract theory, the amount of damages should reflect assumptions as to continuation of employment, salary increments, as well as deductions for expected living expenses, and income taxes (Iranian Federal and State). Obviously, undiminished lost salary is not the figure to be employed.

18. In a footnote to the interrogatory answer, plaintiffs' counsel alerted defendant to a written statement by Dr. Simonton which had been prepared for plaintiffs' original counsel in February 1979. In the statement, Dr. Simonton described in detail his observations of Mr. Basch. The letter had been produced to defense counsel on January 13, 1983 during a deposition of Mrs. Basch.

swer.[19] The supplemental response stated that Dr. Simonton "will testify as to the contents of his letter of February 16, 1979.... The subject matter contained in his report are based on his factual observations of Philip Basch." On August 17, 1983 plaintiffs designated Dr. Bernard Heckman as their expert witness on the issue of liability.

In response to the discovery tactics, Westinghouse filed a motion for sanctions for plaintiffs' "failure to properly answer interrogatories." A hearing was conducted on October 11, 1983. At the hearing, plaintiffs gave what can only be characterized as a series of inconsistent explanations of Dr. Simonton's status. In addition, plaintiffs' counsel offered no excuse for waiting until June 1, 1983 to file a supplemental answer, and instead chose to point a finger at defense counsel for proceeding with the deposition without ascertaining Dr. Simonton's precise status.

After hearing from both sides, the district court imposed sanctions on plaintiffs' counsel, pursuant to Fed.R.Civ.P. 11 and 37(d), for abuse of the discovery process.[20] The court first found that defendant would have deposed Simonton even if he had been designated as exclusively a fact witness. The court found, however, that defendant would have sent an associate, not a partner, to a deposition of a "mere" fact witness. Consequently, the difference between the partner's hourly rate and an associate's rate, amounting to $975, was assessed as a sanction. In addition, the district court ordered plaintiffs' counsel to pay defendant's cost in prosecuting the motion for sanctions—$781, and ruled that Dr.

Simonton could not testify at the trial as an expert witness.

■ Plaintiffs contend that there is no basis in the record to support the imposition of sanctions. Upon a review of the record, however, we cannot, sitting as an appellate court, conclude that the district judge abused his discretion. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976); *Hindmon v. National-Ben Franklin Life Ins. Corp.*, 677 F.2d 617, 620 (7th Cir.1982); *Stillman v. Edmund Scientific Co.*, 522 F.2d 798, 801 (4th Cir.1975). The initial interrogatory answer, as found by the district court, caused defense counsel to conclude that Dr. Simonton was going to testify as a medical expert for plaintiffs. That conclusion was hardly unreasonable, as the district court explained, in that (1) Dr. Simonton was listed in response to the question seeking a list of experts and (2) the answer stated that the doctor's opinion would be based on his medical training. Moreover, the misunderstanding, which plaintiffs' counsel should have been aware of by the nature of Mr. Sharpe's May 17, 1983 letter, was never cured by plaintiffs until it was too late to avoid the unfortunate consequences. Although plaintiffs were not found by the district court to have been intentionally misleading, we agree that counsel's conduct unnecessarily multiplied defendant's cost of litigation by encouraging Sharpe, at his higher hourly rate, to depose the only designated expert witness.

■ Plaintiffs' counsel also objects to the sanctions chosen by the court. We find, however, that the monetary sanctions

**19.** The pleading was mailed on June 1, 1983 too late to be received before the deposition.

**20.** Rule 11, recently expanded in 1983, confers broad authority over an attorney who signs a pleading. It states that the attorney must certify that the pleading was not interposed for "any improper purpose" such as to "cause unnecessary delay or needless increase in the cost of litigation." The rule gives the court the power to impose on the attorney "an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reason-

able expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee." Rule 37(d) specifically addresses sanctions for *failing* to answer interrogatories. Several courts, however, have expanded Rule 37(d) to encompass answers which were evasive or misleading. *See, e.g., Airtex Corp. v. Shelley Radiant Ceiling Co.*, 536 F.2d 145, 155 (7th Cir.1975); *Bell v. Automobile Club of Michigan*, 80 F.R.D. 228 (E.D.Mich. 1978).

imposed on plaintiffs' counsel properly were documented and were tailored narrowly to the extra costs caused by plaintiffs' misconduct in discovery. The portion of the order which bars Dr. Simonton from testifying as an expert will be affirmed as we believe plaintiffs should be held to their representations in the second interrogatory answer and at the deposition.

█ Westinghouse asks for fees and expenses incurred in connection with defending the instant appeal. *See, e.g., Mickwee v. Hsu,* 753 F.2d 770 (9th Cir.1985); *Tamari v. Bache & Co. (Lebanon) S.A.C.,* 729 F.2d 469 (7th Cir.1984). The present case, however, does not present an appropriate occasion to penalize counsel for having taken an appeal from the district court's sanction. Seidenman's appeal, although found to be without merit, was not frivolous nor was it interposed to harass defendant or to delay implementation of a valid discovery order.

The judgments appealed from are accordingly affirmed except the judgment concerning the recoverability of lost profits in the case liability for contract breach is established. As to that item, the judgment is vacated and the case remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART AND VACATED AND REMANDED IN PART.