**Lercy D. BENITEZ–ALLENDE, et al., Plaintiffs, Appellees,**

v.

**ALCAN ALUMINIO DO BRASIL, S.A., et al., Defendants, Appellants.**

**Lercy D. BENITEZ–ALLENDE, et al., Plaintiffs, Appellants,**

v.

**ALCAN ALUMINIO DO BRASIL, S.A., et al., Defendants, Appellees.**

Nos. 87–2111, 88–1089.

United States Court of Appeals, First Circuit.

Heard June 10, 1988.

Decided Sept. 20, 1988.

Rehearing and Rehearing En Banc Denied Oct. 24, 1988.

Federico Lora Lopez, Hato Rey, P.R., for plaintiffs, appellees.

Lawrence A. Salibra, II, Sr. Counsel, with whom Eugenio C. Romero and Goldman & Antonetti, Santurce, P.R., were on brief, for defendants, appellees.

Before BOWNES and BREYER, Circuit Judges, and CAFFREY,* Senior District Judge.

BREYER, Circuit Judge.

The three plaintiffs in these diversity cases claimed that Alcan Aluminio do Brasil, S.A. (Alcan/Brasil) manufactured defective pressure cookers, which injured them. All three won jury verdicts (based on negligence or strict liability) against Alcan/Brasil; one plaintiff also obtained a verdict against Manuel Diaz, Alcan/Brasil's Puerto Rican "sales representative." All parties appeal. We deny the defendants' claims and, with one exception, the plaintiffs' claims as well.

I

*The Facts*

After reading the record and drawing appropriate inferences favorable to the plaintiffs, *Gray v. New England Telephone and Telegraph Co.*, 792 F.2d 251, 253 (1st Cir.1986), we believe the jury could have found the following basic facts:

1. Alcan/Brasil manufactures the Rochedo pressure cooker. It is a pot with a tight-fitting lid that seals food and water inside. The water, turning to steam when heated, creates pressure that helps cook the food. To prevent the pot from exploding, the Rochedo cooker (like many others) has two safety devices. The first is a heavy piece of metal that sits in a small valve on the cooker's lid. When steam pressure inside the cooker is low, the weight seals the valve shut; when steam pressure builds up, it lifts the metal piece, releasing steam, so that the pot will not explode. Second, the cooker contains in that part of the handle attached to the pot a "fusible seal," a piece of solid material (such as lead) that will melt should heat and pressure inside the cooker become too high. Once the seal melts, the steam can safely escape through the hole that the seal previously filled. Alcan deliberately makes the cooker very difficult to open until it is cool and the build-up of pressure has subsided; otherwise, a person who opened one might find its contents (or its top) propelled by the remaining pressure out into the room.

2. The three plaintiffs were hurt as follows: (a) On July 29, 1983, Lercy Benitez Allende was cooking gizzards in a Rochedo cooker. She set it in the sink to cool. When she removed the top, the hot meat and liquid flew out, burning her. (b) On February 6, 1984, Ramonita Andino Rosa put meat and water in the cooker, put the cooker on the stove, and left the room. Her daughter Ramonita Garcia Andino saw the cooker "move sideways" and she saw some steam came out of the plug. The cooker then exploded; the top came off; and the hot contents burned her. (c) On November 11, 1983, Carmen Cruz Diaz put beans and water in a Rochedo cooker and put it on the stove. The safety valve initially let off steam; but evidently not enough, for the lid flew off and hit her.

3. Alcan/Brasil made the cookers so that a user could open them by applying 25 pounds of force to the handle, even when the pressure inside the cooker was dangerously high. (Underwriters' Laboratories says that cookers should seal so tightly that it takes 100 pounds of force to open them when there is steam pressure inside them.) Alcan/Brasil made the "fusible seal" so that it would not melt until the inside pressure was about four times the

---

* Of the District of Massachusetts, sitting by designation.

"maximum operating pressure." (Underwriters' Laboratories says it should melt once the pressure rises to *twice* the "maximum operating pressure.")

On the basis of these facts, the jury concluded that each cooker was defective, apparently because, in the case of Benitez Allende, it opened too easily under pressure, and, in the "exploding cooker" cases of Andino and Cruz Diaz, because the second safety device didn't work quickly enough. It also concluded that the defect caused the injuries (apparently in the case of the "exploding cookers" because the second safety device didn't let off steam in time). Also since it found the plaintiffs who used the cookers "contributorily negligent," it may have thought they had not put the lids on as tightly as they said that they had.

We turn now to the legal claims on appeal.

## II

### *The Defendants' Appeal*

A. *Jurisdiction*

1. Alcan/Brasil, conceding that Puerto Rico's "long arm" jurisdictional statute, Rule 4.7(a)(1) of the Puerto Rico Rules of Civil Procedure, stretches "up to the point allowed by the Constitution," *Industrial Siderurgica v. Thyssen Steel Caribbean, Inc.,* 114 D.P.R. 548, 558 (1983) (footnote omitted), says that its contacts with Puerto Rico are so few that it does not comport with "traditional notions of fair play and substantial justice," *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), to subject it to jurisdiction in Puerto Rico. It says that it made cookers for sale "FOB Brazil;" it did not directly advertise in the United States; it simply filled orders sent by American wholesale buyers to Brazil; it was the decision of Alcan/Brasil's *buyers,* not Alcan/Brasil, to ship the cookers to Puerto Rico and to sell them there. In its view, because these contacts are so slim, the Constitution forbids assertion of jurisdiction. *Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

We think the following facts sufficient to show that jurisdiction is, constitutionally speaking, permissible. First, Alcan/Brasil manufactured thousands of Rochedo cookers that, in fact, were sold in the United States. It sold 300,000 Rochedo cookers that Americans bought between 1977 and 1981; of that number, Puerto Ricans bought 240,000. Second, Alcan/Brasil knew that Americans would use its cooker in commerce in America, and it intended that result. Third, Alcan/Brasil took active steps to sell its cookers in Puerto Rico. In 1972 it hired an "export advisor," Erich Schmid, to travel to Puerto Rico to meet an American, defendant Manuel Diaz. Schmid and Diaz discussed how Alcan/Brasil could sell cookers in Puerto Rico. They agreed that Diaz could solicit orders for Rochedo cookers from Puerto Rican wholesalers and retailers: he would send orders to Alcan in Brazil; title would pass in Brazil; and the buyers would pay for transportation from Brazil to Puerto Rico. Diaz, who called himself Alcan/Brasil's "sales representative," lived in Florida, but travelled to Puerto Rico to sell Rochedo cookers and other products, at least four times a year. (In 1983, Diaz formed "Group Brazil, Inc.," a corporation, which carried on the work he previously had done on his own.)

As we read the latest opinion of the Supreme Court on the subject, *Asahi, supra,* the views of the majority are such that Alcan/Brasil's knowledge and intent of the sale of its cookers in Puerto Rico, and the number of cookers actually sold, provide a sufficient basis for the assertion of jurisdiction. In *Asahi, supra,* the Court considered whether the Constitution permitted a California court to assert jurisdiction over a Japanese firm that made tire valves, and sold them to a tire company in Taiwan, which, in turn, inserted them into tires sold (for motorcycle use) in California.

Four justices would have found the "minimum contacts" ordinarily sufficient to make jurisdiction constitutional in the fact that the Japanese company "was aware" that significant amounts of its product would be sold in California and that it would benefit from those sales. They pointed out that the firm "deliver[ed] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Asahi*, 107 S.Ct. at 1037 (Brennan, J., concurring in part and in the judgment) (quoting *Woodson*, 444 U.S. at 297–98, 100 S.Ct. at 567). Their appearance in California was not because "a consumer ... took them there," *Asahi*, 107 S.Ct. at 1037 (quoting *Woodson*, 444 U.S. at 306–07, 100 S.Ct. at 584); nor was that appearance "one isolated occurrence." *Asahi*, 107 S.Ct. at 1036 (quoting *Woodson*, 444 U.S. at 295, 100 S.Ct. at 566). A fifth justice added that he "would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute 'purposeful availment' [of the benefits of the forum state] even though the item delivered to the forum State was a standard product marketed throughout the world." *Asahi*, 107 S.Ct. at 1038 (Stevens, J. concurring in part and concurring in the judgment).

■ The opinion of the remaining four justices indicates that, once the factor of the meetings between Schmid and Diaz is taken into account, all nine justices would find the assertion of jurisdiction constitutional. These four justices state that:

> The "substantial connection," ... between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.*

*Asahi*, 107 S.Ct. at 1033 (plurality opinion) (emphasis in original) (citations omitted). Although they say that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State," they immediately go on to say that:

> Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.

*Id.* The deliberate marketing effort here consisting of the contracts between Schmid and Diaz is sufficient to satisfy this latter criterion. The fact that title to the cookers passed in Brazil is beside the point, for "[i]f *International Shoe* stands for anything, however, it is that a truly interstate business may not shield itself from suit by a careful but formalistic structuring of its business dealings." *Vencedor Manufacturing Co., Inc. v. Gougler Industries, Inc.*, 557 F.2d 886, 891 (1st Cir.1977).

Of course, the Supreme Court in *Asahi* held that California could *not* assert jurisdiction. But, that holding rested upon special features of the case, not present here. Those features made *Asahi* "one of those rare cases in which 'minimum requirements inherent in the concept of "fair play and substantial justice" ... defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities.'" *Asahi*, 107 S.Ct. at 1035 (opinion of Brennan, J.) (citations omitted). Those special circumstances were: (1) California's interest in the controversy was limited, for the dispute concerned *only indemnification* of a Chinese manufacturer by a Japanese supplier; (2) the distance to California was great, and the legal system was different; and (3) other forums likely had a greater interest in, and knowledge about the indemnification issue, which concerned contracts and sales made in the Orient. Here the forum's interest is in protecting its citizens from injuries caused by defective products; the distance is less great; the legal system is roughly similar, and Puerto Rico has as much interest as any other political forum in the controversy. *See McGee v. International Life Insurance Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957). All of this is to

say that *Asahi*'s special circumstances for denying jurisdiction are not present here, while the Court's reasoning in *Asahi* clearly implies that the district court's assertion of jurisdiction here is constitutionally permissible.

■ 2. Alcan/Brasil also argues that the Constitution's "foreign commerce clause," U.S. Const. Art. I, § 8, (giving Congress the power to regulate commerce with foreign nations) forbids Puerto Rico from asserting jurisdiction. We do not see how this is so; indeed, every state to our knowledge permits its citizens to bring tort actions against foreign manufacturers who send defective products into their jurisdictions. *See* Annotation, *Products Liability: In Personam Jurisdiction Over Nonresident Manufacturer Or Seller Under "Long–Arm" Statutes,* 19 A.L.R.3d 13 (1968 & Supp.1987) and cases collected therein. Appellants cite *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), but that case concerned California's power to tax a Japanese cargo container ship which spent a portion of the year at a California dock. The case raised the question of the extent to which an individual state may tax "instrumentalities of commerce" such as cargo containers, *Japan Line,* 441 U.S. at 442, 99 S.Ct. at 1818, railroad rolling stock, *Pullman's Palace Car Co. v. Pennsylvania,* 141 U.S. 18, 11 S.Ct. 876, 35 L.Ed. 613 (1891), aircraft, *Braniff Airways, Inc. v. Nebraska State Bd. of Equalization,* 347 U.S. 590, 74 S.Ct. 757, 98 L.Ed. 967 (1954) and barges, *Ott v. Mississippi Valley Barge Line Co.,* 336 U.S. 169, 69 S.Ct. 432, 93 L.Ed. 585 (1949). This case does not involve "instrumentalities of commerce," a matter the Constitution grants Congress specific authority to regulate. U.S. Const. Art. I, § 8, cl. 3. It concerns tort law, a subject matter that historically belongs to the states. Any analogy between this case and *Japan Line* strikes us as too far-fetched to warrant further consideration.

### B. *The Evidence–Related Claims*

■ 1. Both defendants (Alcan/Brasil and Diaz) argue that the evidence was not sufficient to support the Andino and Cruz Diaz verdicts. They seem to rest their claim on the following circumstances: (1) the users testified that they closed the cookers' lids tightly; (2) the plaintiffs' expert testified that explosion of a tightly closed cooker would deform the pot or lid; and (3) the pot and lid of Cruz Diaz's cooker were not noticeably deformed, while the pot and lid of Andino's cooker were only slightly deformed. They conclude because of these three facts (and the fact that plaintiff's expert did not discuss the issue of causation in detail) that the jury could not have found that a safety mechanism failure caused the plaintiffs' injuries.

Their conclusion, however, does not follow from these premises. The jury may have believed plaintiffs' account of the exploding pots, but thought the plaintiffs were mistaken as to how tightly they had closed the lids; or it may have thought that vibrations on the stove loosened the lids. The jury might also reasonably have concluded that the accident would not have occurred had the second, "fusible seal" device worked properly; and that it was the very sort of accident that "fusible seals" were designed to prevent—all of which would permit a finding of causation.

The defendants add that the accident was impossible because those plaintiffs testified that they saw steam escaping through the first safety device, and because plaintiff Benitez Allende said she cooled the cooker before opening it. The jurors, however, may have believed that the accident did occur as plaintiffs said, but that the first safety device did not work properly because not *enough* steam escaped, or, they may have thought that plaintiffs were wrong about steam escaping. They may have thought that the cooker was not as cool as Allende Benitez thought when she opened it. All of these matters are for the jury to decide.

2. The defendants claim that the district court should have granted a motion for summary judgment that they made on August 9, 1987. That motion had two parts. First, it pointed to the contradictions in testimony that we mentioned in subsection

B.1 above. It pointed out that it cannot be true that plaintiffs' expert's testimony was correct *and* that the cooking pots were not deformed *and* that the lids were on tight when the cookers exploded; it cannot be true that the Benitez Allende cooker had cooled to room temperature *and* that the food flew out when Benitez Allende opened it. As we said, however, it was up to the jury to decide how to resolve any such conflicts. It was up to the jury to decide just where and how the plaintiffs' (or expert's) testimony was correct or mistaken. The jury, in fact, likely reached the commonsense conclusions that the lids were not on tightly or that they were jarred loose; and that the pressure of the cooker had not fallen. The record at the time of the summary judgment motion in these respects presented "genuine" and "material" issues of fact. Fed.R.Civ.P. 56.

■ Although plaintiffs' expert's deposition was somewhat vague and conclusory, Rule 56 does not *require* the district court to grant summary judgment in such circumstances; rather, the court may choose, in its discretion, to "give the parties an opportunity to fully develop the case." *Marcus v. St. Paul Fire & Marine Ins. Co.*, 651 F.2d 379, 382 (5th Cir.1981), such as the opportunity to clarify vague statements by proceeding to trial. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2728 nn. 11, 12 (1983 & Supp.1987).

■ 3. The second claim that defendants' summary judgment motion made was that the court should not permit plaintiffs' expert, Dr. Kenneth G. Soderstrom, to testify; and, without his testimony, plaintiffs could not prove their case. Assuming this latter point for the sake of argument, we consider whether or not the district court should have permitted Dr. Soderstrom to testify specifically in respect to his opinions about the likely defects in the plaintiffs' cookers. Defendants argue here (as they argued to the district court) that Soderstrom's testimony should be excluded because at his deposition only two days before the close of discovery (which had taken place over a period of 26 months), he

would not offer "a complete judgment" about how the particular cookers "related to the injuries alleged"; he said he had not "seen yet the full depositions of the people that were involved in those accidents" and that prior to the deposition, he "wasn't examining the pots." Defendants say that plaintiffs had more than adequate time to supply their expert with their full story and with the pots. Their failure to do so, and Dr. Soderstrom's consequent failure to provide a complete, detailed account of his views at the deposition warrant exclusion of his later, more detailed, trial testimony as an appropriate sanction.

The district court, however, before permitting Dr. Soderstrom to testify, established that, in his deposition, he provided the defendants with the essence of his views (that the pots could be opened too easily under pressure; that the second safety device did not melt quickly enough). The court also told the defendants it would give them "plenty of leeway to deal with [Soderstrom] and ask him why it is when you deposed him he had no opinion." Further, Soderstrom's uncertainty did not reflect *only* plaintiffs' failure to comply with the court's discovery schedule. The defendants too were somewhat dilatory. They did not supply plaintiffs with tests that Alcan/Brasil commissioned from an independent laboratory—tests about the cookers' tendency to explode—until plaintiffs obtained a specific court order, two months after Soderstrom's deposition and the previously designated "close" of discovery, and just one month before trial. On these facts, the district court could have decided that the sanction of exclusion was not warranted.

Under Fed.R.Civ.P. 37(b), the district court "may," when faced with parties who disobey discovery rules, "make such orders in regard to the failure as are just," such as excluding testimony or establishing facts as proven before trial, Rule 37(b)(2)(A), (B); *Basch v. Westinghouse Electric Corp.*, 777 F.2d 165, 174–75 (4th Cir.1985), *cert. denied*, 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986); *Davis v. Marathon Oil Co.*, 528 F.2d 395, 403 (6th

Cir.1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976), or even dismissing a claim entirely. Rule 37(b)(2)(C); *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Ganapolsky v. Keltron Corp.,* 823 F.2d 700, 701 (1st Cir.1987). Rule 37(b)'s permissive language gives the district court discretion *not* to impose sanctions as well. Courts, including this one, have consistently held that such sanction decisions are primarily for the district court, not this court. *National Hockey League, supra; Ganapolsky, supra.* And, given the circumstances, we cannot say that the district court's decision not to impose sanctions exceeded its lawful powers.

■ 4. The defendants argue that the introduction into evidence of the "Battelle Report" violates Fed.R.Evid. 407, a rule that, in relevant part, says:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.

Alcan/Brasil commissioned the Report on its Rochedo cookers in 1982 before these accidents took place. But, because it used the Report's results to help plan a "voluntary" recall of its defective cookers (in cooperation with the Consumer Products Safety Commission), it claims that the Report was part of an effort to improve the safety of its product, and that the rule, therefore, forbids its admission.

We do not agree. Rule 407 prevents the admission of evidence of what its title refers to as "Remedial Measures." The Battelle Report itself describes the results of a "diagnostic test," not remedial measures. It makes no reference to a product recall or to specific accidents; it discussed the features of the cooker; it preceded repairs. Thus, *by itself,* the Battelle Report "would" not "have made the event less likely to occur." It was more an "internal investigatory report" of the sort not protected by Rule 407. *See, e.g., Rocky Mountain Helicopters, Inc. v. Bell Heli-*

*copters,* 805 F.2d 907, 918 (10th Cir.1986) (upholding district court's admission into evidence of helicopter manufacturer's post-accident "stress test" of potentially defective part because "[i]t would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports"); *Westmoreland v. CBS, Inc.,* 601 F.Supp. 66, 67–68 (S.D.N.Y.1984) (internal investigatory report following allegedly libelous broadcast not "remedial measure" rendered inadmissible by Rule 407). In any event, the appellants stipulated, in the pretrial order, to the truth of "the facts in the Battele [sic] study." Given this stipulation, even if the admission of the Battelle Report were improper, any error would be harmless.

■ 5. The defendants argue that the district court should not have admitted a 1975 Underwriters' Laboratories report into evidence. The report discusses the characteristices of a 4–quart and a 6–quart pressure cooker. But, defendants claim, plaintiffs did not show that the 4–quart cooker it describes was the same kind that the plaintiffs used; and, they add, the information about the 6–quart cooker was irrelevant. The Underwriters' Laboratories report on its face, however, appears to describe a typical 4–quart cooker; and that fact makes the safety feature it mentions relevant to the present case. Also, when Dr. Soderstrom testified, the district court restricted his comments to that part of the report reviewing the 4–quart cooker. The trial court also allowed the appellants to cross-examine Dr. Soderstrom about the relevance of the report. We can find no legal error. Fed.R.Evid. 403.

## C. *Diaz's Liability As A "Broker"*

■ Appellant Diaz argues that he should not be found liable to plaintiff Garcia Andino because (1) the court's charge to the jury "specifically required the jury to find that Diaz *'manufactured'* the cookers ... in order to establish strict liability," and (2) the "record contains no evidence that Diaz was a manufacturer of the cookers." The fatal flaw in this argument lies

in the first proposition. The court did *not* charge the jury that it could find Diaz strictly liable if it found that *Diaz* manufactured the cooker; rather, the court charged the jury that it could find Diaz strictly liable if it found that *Alcan/Brasil* manufactured the cooker.

The court's charge, in relevant part, reads as follows:

> In order to [recover] under the strict liability theory of products liability principles, plaintiffs must establish three essential elements, which are the following: *First, that the defendant, Alcan Aluminio do Brasil, S.A., manufactured the pressure cookers, which* at the time, that Alcan manufactured them, *were in a defective condition;* such that they failed to meet the average quality of similar products. Second, that the plaintiffs, in fact, suffered injuries, as ultimate users of these pressure cookers. And third, that the defective condition of said pressure cookers proximately caused the injuries to the plaintiffs. If you find that plaintiffs have established each of these elements by a preponderance of the evidence, then you may find for the plaintiffs. Otherwise, if you are not satisfied that the above-mentioned elements were proved by a preponderance of the evidence, then you will find for the defendants. [Tr. 504] (emphasis added).

> .    .    .    .    .

> In the case of Ramonita Garcia Andino, we have a second defendant in addition to Alcan, Mr. Manuel Diaz. He is a named defendant, only in that case.... In order to find Mr. Manuel Diaz liable under the theory of strict liability, you must decide *his case based on the same instruction that I gave you regarding the alternate theory of recovery of strict liability* in relation to Alcan Aluminio do Brasil, S.A. Please remember, that the plaintiffs are not proceedings against Mr. Diaz, on the basis of the general theory of negligence. [Tr. 508–09] (emphasis added).

The underlined words make clear that the jury is to find Diaz strictly liable based *"on the same instruction"* the court gave in

respect to Alcan/Brasil, which instruction said that it must find that Alcan/Brasil made the cooker.

This instruction seems correct. As far as we can tell, the parties do not dispute the fact that Diaz was a broker or "sales representative," a middleman in the distribution chain. Although Puerto Rico has not adopted the whole common law of torts, *Valle v. American International Insurance Co.*, 108 D.P.R. 735 (1979), it has chosen to adopt the principles of strict liability laid out in *Restatement (Second) of Torts* § 402A (1965). *Montero Saldana v. American Motors Corp.*, 107 D.P.R. 501 (1978); *Mendoza v. Cerveceria Corona, Inc.*, 97 P.R.R. 487, 499 (1969). And, courts following that section have routinely found "sales representatives" strictly liable for distributing defectively manufactured products. *See, e.g., Little v. Maxam, Inc.*, 310 F.Supp. 875 (S.D.Ill.1970); *Barth v. B.F. Goodrich Tire Co.*, 265 Cal.App.2d 228, 71 Cal.Rptr. 306 (Cal.Ct.App.1968); *Kirby v. Rouselle Corp.*, 108 Misc.2d 291, 437 N.Y.S.2d 512 (N.Y.Sup.Ct.1981); *Zamora v. Mobil Corp.*, 104 Wash.2d 199, 704 P.2d 584 (Wash.1985). If, in fact, Diaz believed he was not part of the distribution chain, or if he disputed the court's application of the law in the instruction making him automatically liable should Alcan/Brasil prove liable, or if he believed the instruction otherwise ambiguous or erroneous, he should have objected in the trial court, or requested a different instruction and appealed, pointing directly to the overruled objection or denied request. *Elwood v. Pina*, 815 F.2d 173, 175–76 (1st Cir.1987). We can find no such objection or request; and for reasons just mentioned, there is no "plain error." *Elwood*, 815 F.2d at 176; *Brown v. Freedman Baking Co., Inc.*, 810 F.2d 6 (1st Cir.1987).

### III

#### *The Plaintiffs' Appeal*

##### A.  *Consumer Products Safety Act*

■ The plaintiffs appeal the district court's dismissal of a claim they asserted under the Consumer Products Safety Act.

15 U.S.C. §§ 2051–82 (1982 & Supp. I 1983). In that claim they pointed to a rule of the Commission which requires manufacturers to report to the CPSC any information indicating their products are defective. 16 C.F.R. Part 1115, §§ 1115.1–.22 (1988). They also pointed to 15 U.S.C. § 2072(a), which says that anyone who "sustain[s] injury" as a result of a "knowing ... violation" of a Commission rule, may bring an action in federal court to recover "damages sustained, and may, if the court determines it to be in the interest of justice, recover costs of suit, including reasonable attorney's fees." Presumably plaintiffs hope that, through this claim, they can recover the attorney's fees denied them in their Commonwealth tort suit.

Although some district courts have permitted statutory actions for "failure to report," *see, e.g., Wilson v. Robertshaw Controls Co.,* 600 F.Supp. 671 (N.D.Ind.1985), the only circuit court to rule on the question, the Eighth Circuit, has not. *Drake v. Honeywell, Inc.,* 797 F.2d 603 (8th Cir. 1986). The Eighth Circuit specifically held that Congress did not, in § 2072(a), create a "private right of action" based upon violation of the Commission's *procedural reporting rule,* a rule that basically repeats and elaborates the reporting requirements contained in a different statute, 15 U.S.C. § 2064(b). The Eighth Circuit pointed out that to interpret § 2072 to allow this type of private action would be odd; technically speaking, for the language of § 2072 provides a private right of action to enforce the Commission's "rules" and "orders;" it says nothing about enforcing provisions of the statute itself, such as the reporting requirements of § 2064(b). The parties point to nothing in the legislative history suggesting that Congress intended a private right of action to arise whenever a manufacturer violates a statutory reporting requirement. Yet, to permit such an action would have broad substantive implications. It would mean plaintiffs could bring many (perhaps nearly all) products liability suits in federal court and obtain attorney's fees by alleging that the manufacturer of the defective product should have told the Commission about the defect.

It seems unlikely Congress would have intended to bring about such an important result without even mentioning the matter. We see no need to repeat here the entire Eighth Circuit's analysis. We agree with its result for the reasons it has set forth. *Drake, supra.*

### B. *Attorneys Fees*

The plaintiffs appeal the district court's denial of their request for attorney's fees—fees that are to be awarded under Puerto Rico's law only when the district court finds a party "obstinate." P.R.R.Civ.P. 44.1(d); *Fernandez Marino v. San Juan Cement Co.,* 87 J.T.S. 37 (1987). The district court here found that the defendants were not obstinate; and in doing so, it acted within the bounds of its lawful authority. Rule 44.1(d); *Fernandez, supra.*

### C. *Amending the Complaint*

■ Plaintiffs Cruz Diaz and Benitez Allende appeal the denial of their motions, made on December 16, 1985, to amend their complaints to add Manuel Diaz as a defendant. They argue that the district court allowed plaintiff Andino's similar motion to amend her complaint and that their circumstances are indistinguishable.

The circumstances are as follows. The three plaintiffs filed their complaints at different times between July 26, 1984 and January 25, 1985. In mid-December 1985, all three moved to amend their complaints to add Diaz. They said that they had originally thought Diaz was president of a corporation called Group Brasil, which distributed the cookers. They had included Group Brasil as defendant in the lawsuit; Diaz was aware of the proceedings. They added that recently they had learned that Diaz had acted *individually* as a distributor prior to 1983 when he formed Group Brasil. Therefore they wished to sue him individually.

Diaz opposed these motions to add him as a defendant by arguing that, as a "broker," he was not liable under Puerto Rican tort law for the plaintiffs' injuries. (For

the reasons stated in Part II.C, *supra,* this argument was likely incorrect.)

In late November 1986, the district court denied all three plaintiffs' motions to amend. The district court accepted Diaz's (legally invalid) broker-liability argument, but it added that, in any event, the proposed actions against Diaz were time-barred under Puerto Rico's statute of limitations, 31 L.P.R.A. § 5298 (1968), which allows parties only one year after the date of injury to bring a tort complaint. Since all three plaintiffs had filed a complaint within one year of injury, the district court must have thought that in respect to Diaz, the relevant "filing" date was the date of the "Motion to Amend." That is to say, the court must have thought the amendments would not "relate back" to the date of the complaint. *But see* Fed.R.Civ.P. 15(c).

On December 8, 1986, all three plaintiffs, pointing to Fed.R.Civ.P. 15(c), asked the court to reconsider its ruling. In an Opinion and Order dated January 21, 1987, the district court reconsidered in respect to Andino, and granted Andino's request to amend her complaint to sue Diaz. The court wrote:

Federal Rule of Civil Procedure 15(c) permits an amendment adding a party to relate back to the date of the original pleading if three conditions are met: (1) the claims against the new party arise out of the same occurrence as the claims in the original pleading, (2) the new party received "notice of the institution of the action" before the limitations period expired, and (3) the new party "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him." *Hernandez Jimenez v. Calero Toledo,* 604 F.2d 99, 102 (1st Cir.1979), *citing* C. Wright & A. Miller, *Federal Practice and Procedure* sec. 1498 at 507 (1971).

The institution of the action serves as constructive notice to the parties added after the limitations period expired, when the original and added parties are so closely related in business or other activi-

ties that it is fair to presume the added parties learned of the institution of the action shortly after it was commenced. *Id.,* at 102–03. We find that Diaz, as president of Group Brazil, had such constructive notice and, therefore GRANT plaintiffs' motion to amend the complaint to add him as a defendant.

Opinion and Order, *Ramonita Garcia Andino v. Alcan Aluminio do Brasil S.A.,* 652 F.Supp. 415, 419 (D.P.R.1987). *See also Serrano v. Torres,* 764 F.2d 47, 49–50 (1st Cir.1985). On March 18 and 19, 1987, however, the district court denied the apparently identical motions of plaintiffs Cruz Diaz and Benitez Allende.

Like Cruz Diaz and Benitez Allende, we can find no reason why the district court would grant Andino's motion and deny theirs. Although Rule 15(a) generally commits the decision of motions to amend to the discretion of the trial court, *Best Canvas Products and Supplies, Inc. v. Ploof Truck Lines, Inc.,* 713 F.2d 618 (11th Cir. 1983), it also says that permission to amend should be "freely given when justice so requires." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The "policy of Rule 15(a) in liberally permitting amendments to facilitate determination of claims on the merits circumscribes the exercise of the trial court's discretion; thus '[u]nless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.'" *Espy v. Wainwright,* 734 F.2d 748, 750 (11th Cir.1984) (citation omitted); *Foman v. Davis,* 371 U.S. at 182, 83 S.Ct. at 230. The district court explained why the "statute of limitations" issue was irrelevant; it found no other "substantial reason" for denying the motions to amend. Hence, we conclude that it should have granted the Cruz Diaz and Benitez Allende motions, as it did Andino's.

The district court will remain free, on remand, to determine whether in the changed circumstances of the case, amendment is no longer appropriate.

*The judgments of the district court against Alcan/Brasil and Diaz are Affirmed.*

*The judgments insofar as they disallow the claims of Cruz Diaz and Benitez Allende against Manuel Diaz are vacated and the cases are remanded for proceedings consistent with this opinion.*