Kenneth R. BARTOW, Diane Bartow, and Nicholas Bartow, a minor by his mother and next friend Diane Bartow, Plaintiffs,

v.

EXTEC SCREENS AND CRUSHERS, LTD., Extec of North America, and Extec of America, Defendants.

No. Civ.A. 97–30268FHF.

United States District Court, D. Massachusetts.

June 9, 1999.

Patrick C. Gable, Michael J. Chieco, Pellegrini & Seeley, Springfield, MA, for Kenneth R. Bartow, Nicholas A. Bartow, plaintiff.

Earlon L. Seeley, Jr., Patrick C. Gable, Michael J. Chieco, Pellegrini & Seeley, Springfield, MA, for Diane Bartow, plaintiff.

Damian R. LaPlaca, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Boston, MA, for Extec Screen and Crushers Ltd., defendant.

Roy H. Anderson, Michael J. Julian, Anderson & Miller, Springfield, MA, for Extec of North America, defendant.

## MEMORANDUM AND ORDER

FREEDMAN, Senior District Judge.

### I. INTRODUCTION

On December 16, 1994, while working in Sheffield, Massachusetts, Kenneth R. Bartow, a Massachusetts resident, fell off of a debris-crushing machine manufactured by Extec Screens and Crushers, Ltd. ("Extec"), a British company. Having allegedly injured his back, Bartow filed a products liability suit against Extec, Rent–A–Screen d/b/a Extec of North America ("Rent–A–Screen"), a Pennsylvania corporation and Extec's independent distributor in the United States, and Rent–A–Screen's predecessor corporation, Shredall, Inc., d/b/a Extec of America ("Shredall"). Bartow's wife and son join his suit seeking loss of consortium damages. Extec moved to dismiss for lack of personal jurisdiction. The Bartows opposed the motion to dismiss, moved for limited discovery on the issue of personal jurisdiction, and as an alternative to dismissing the case, to transfer it to the Eastern District of Pennsylvania. After a hearing on June 24, 1998, the Court granted the Bartows' motion for limited discovery on the issue of personal jurisdiction. The Court now addresses Extec's motion to dismiss and the Bartows' motion to transfer.

### II. STANDARD

 In determining a plaintiff's satisfaction of its burden of establishing prima facie personal jurisdiction, the court "ascertains only whether the facts duly proffered, [and] fully credited, support the

exercise of personal jurisdiction." *See Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 83–84 (1st Cir.1997) (citing *Boit v. Gar–Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir.1992)).

## III. FACTUAL AND PROCEDURAL HISTORY

Starting in the late 1980s, Extec conducted market research in Massachusetts to find customers and evaluate the demand for its debris-crushing and sorting equipment. The type of mobile screening plant involved in this case is commonly used in gravel pits to sift and sort sand and rock, according to size, into different piles. Extec designs its machines to be easily hitched to a trailer and towed to other locations. The machines sell in the price range of between $78,500 and $115,000, depending on their age and condition.

An Extec employee, Colin Douglas, performed the market research in Massachusetts while working for Extec and made several trips to Massachusetts for that purpose.[1] Soon afterwards, and as late as April 28, 1993, Extec sold equipment directly to Equipment and Systems for Industry, Inc. ("ESI"), in Hopkinton, Massachusetts through its agent, Shredall. Then, in 1995, Extec established an independent distributorship agreement with Rent–A–Screen, Shredall's successor in interest, for all fifty United States and Canada. The agreement allowed Extec to remove any geographic area it wished from the territory. It required Rent–A–Screen to exercise its best efforts to sell Extec's products in the sales territory. It also specifically provided that Extec, and not Rent–A–Screen, obtain products liability insurance for the machines Extec manufactured and Rent–A–Screen sold. Extec carries product liability insurance covering machines in all fifty United States and Canada.

In addition to procuring insurance, Extec printed and paid for all advertising brochures that Rent–A–Screen distributes to Massachusetts. The brochures list Extec (Extec), Extec of America (Rent–A–Screen), Extec Midwest, Extec Germany, and Extec of France with all of their addresses and telephone numbers. The brochure also lists a toll-free number which connects to Rent–A–Screen. Rent–A–Screen distributed the brochures to ESI, which displays them in its offices. Extec also advertises on the Internet. *See* Extec home page (visited June 2, 1999): <http://www.extecscreens.com/>

ESI and Shredall, through its controller, Brian Douglas, reached written agreements on December 5, 1991, and April 8, 1993, which provided that ESI would serve as the exclusive dealer for some or all of Extec's products in Massachusetts, Maine, and Rhode Island, and as a non-exclusive dealer in Connecticut, New Hampshire, Vermont, and New York. The dealership agreement of December 1991 prohibited Shredall or its agents from making sales in Massachusetts, and required Shredall to indemnify ESI for design or manufacture defects. This agreement also dictated that Shredall provide regional advertisement material.

In early 1993, on April 23 and again on May 7, Extec sold at least two machines directly to ESI through Shredall, which acted solely as Extec's agent. Extec was to invoice ESI directly and ESI was to pay Extec's bankers directly. Between at least April 1993 and June 1995, Extec maintained title to machines ESI possessed in Massachusetts through bills of exchange. *See* Black's Law Dictionary 149 (5th ed.1979) (defining bill of exchange as three party instrument where first party draws order for second party to pay sum

---

1. He later moved on to serve as president of Shredall, then vice-president and general manager of Rent–A–Screen. Colin's brother, Paul Douglas, is a director of Extec in England. Colin's other brother, Brian, served as Shredall's controller, then worked out of Rent–A–Screen in Pennsylvania, and now works for a Rent–A–Screen office in California.

certain to third party by set date). Extec retained these bills of exchange and ESI paid Extec directly. These bills of exchange allowed Extec to continue selling machines to ESI which had trouble paying on time. ESI paid Extec directly over $800,000 for the nine machines for which Extec retained bills of exchange between 1993 and 1995. At some time in late 1993 or early 1994 Shredall changed corporate entities to become Rent–A–Screen.

Between 1993 and 1995, ESI complained numerous times about Jack Guilfoyle, a salesman selling Extec products in Connecticut, soliciting its customers and making sales in Massachusetts as well as attending a 1995 trade show in Massachusetts, where he played an Extec video. On December 23, 1993, Bartow's employer, O'Connor Brothers, Inc., which owns a sand and gravel site in Sheffield, purchased an Extec 5000 STS portable screening machine, serial number 3525, from Guilfoyle. According to the contract and invoice, Rent–A–Screen then shipped it from Pennsylvania to Connecticut and eventually into Massachusetts. Guilfoyle oversaw aspects of the machine's installation and knew specifically that the machine in this case was bound for Massachusetts. Guilfoyle is from England and regularly travels to the Extec factory there, two to three times per year.

On January 28, 1997, Rent–A–Screen sent ESI a letter terminating any exclusive business relationship between the two companies. Rent–A–Screen, however, continued to sell Extec machines to ESI.

In a fax dated February 27, 1997, Extec's Marketing Manager, Roger Murrow, discussed arrangements for ESI's President, Les Bebchick, to tour Extec's factory in England. Bebchick apparently did meet with Murrow and tour the factory as well as discuss a potentially more direct relationship between ESI and Extec, which never matured. Over the last five to ten years Shredall and Rent–A–Screen have sold approximately 50 to 100 Extec machines into Massachusetts worth millions of dollars.

## III. DISCUSSION

■ To establish personal jurisdiction over Extec, the plaintiffs must satisfy a bifurcated test. They must first establish personal jurisdiction pursuant to the Massachusetts long-arm statute and then establish that jurisdiction comports with due process. *See Noonan v. Winston Co.*, 135 F.3d 85, 89 (1st Cir.1998).

### A. *Massachusetts Long-arm Statute*

■ The Massachusetts long-arm statute reads:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's ... (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth....

Mass.Gen.Laws Ann. ch. 223A, § 3. The Court construes this statute broadly in order to "effectuate ... [the Commonwealth's] legitimate desire to protect its citizens." *Mark v. Obear & Sons, Inc.*, 313 F.Supp. 373, 376 (D.Mass.1970); *see Noonan*, 135 F.3d at 92; *see also* Linda Sandstrom Simard, *Hybrid Personal Jurisdiction: It's Not General Jurisdiction, or Specific Jurisdiction, But Is It Constitutional?*, 48 Case W.Res.L.Rev. 559, 561–67 (1998) (discussing interplay of long-arm statute and due process concerns in modern doctrine of personal jurisdiction).

■ Reviewing the record, the Court concludes that the evidence establishes that Extec's actions in Massachusetts served as longstanding, persistent, and successful efforts to avail itself of consumers in Massachusetts. Extec first conduct-

ed marketing research in Massachusetts in the late eighties. Extec then established Shredall to act as its agent, and then established an independent distributorship for its products with Rent–A–Screen to serve all fifty states, including Massachusetts. Rent–A–Screen engaged in sales of Extec's products through its salesmen as well as an exclusive dealership arrangement in Massachusetts with ESI into the mid–1990s. During this period Extec also sold some machines directly to ESI.

In addition, Extec provided ESI credit to purchase machines for resale in Massachusetts and ESI paid Extec directly for those machines. Extec retained title in the machines through the bills of exchange to facilitate sales by Rent–A–Screen and ensure payment to either Rent–A–Screen or itself. As a result, ESI paid Extec over $800,000 directly for the nine documented machines for which Extec retained bills of exchange between 1993 and 1995. Moreover, according to Colin Douglas, Shredall and Rent–A–Screen have combined to sell several million dollars worth of Extec's machines into Massachusetts. In addition, Rent–A–Screen still sells machines to ESI in Massachusetts.

In 1997, Extec and ESI discussed ESI serving as Extec's direct distributor and Extec's marketing director arranged for ESI's president to tour its English factory. Extec also paid for and produced advertising material that ESI used to facilitate its sales and displayed in its offices in Massachusetts. Moreover, Extec used advertisements on the Internet accessible to Massachusetts consumers.

Extec's advertising and facilitation of financing directly resulted in not only substantial revenue to Extec through its independent distributor, but also, at the very least, documented revenue from Massachusetts totaling over $1,000,000 paid directly from ESI to Extec just between 1993 and 1995. Consequently, the Court concludes that for the purposes of the Massachusetts long-arm statute, Extec "regularly does or solicits business, or en-

gages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth." Mass. Gen.Laws ch. 223A, § 3(d); *see Heins v. Wilhelm Loh Wetzlar Optical Machinery GmbH & Co. KG.,* 26 Mass.App.Ct. 14, 522 N.E.2d 989, 991–92 (1988) *rev. denied,* 402 Mass. 1105, 525 N.E.2d 678 (1988) (exercising jurisdiction over German manufacturer that derived substantial revenue from machines sold in Massachusetts).

As a result, the Court concludes that the Bartows have established prima facie personal jurisdiction over Extec pursuant to the Massachusetts long-arm statute. The Court next considers whether the Bartows have established this Court's personal jurisdiction over Extec within the constraints of due process.

### B. *Constitutional Due Process*

■ The Due Process Clause of the United States Constitution requires satisfaction of two conditions to justify the Court's exercising specific personal jurisdiction over a foreign defendant. "First, the defendant must have purposefully established minimum contacts with the forum such that he can reasonably anticipate being haled into that forum's court." *Boit,* 967 F.2d at 679 (quotations omitted). "Second, if such contacts exist, the exercise of personal jurisdiction over the defendant must comport with 'fair play and substantial justice.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

### 1. *Minimum Contacts*

To analyze Extec's minimum contacts in this product liability case, the Court conducts the stream of commerce analysis, commonly invoked where a product made or sold outside the forum state causes injury within the forum state. *See Rodriguez,* 115 F.3d at 85 (no stream of commerce jurisdiction where rim manufacturer knew purchaser would sell tire/rim combi-

nation in forum but did nothing to target forum); *Boit*, 967 F.2d at 681–83 (no stream of commerce jurisdiction where only knowledge that product could end up in forum); *Benitez–Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 29–31 (1st Cir.1988) (stream of commerce jurisdiction established where foreign manufacturer intended and accomplished sales in forum); *Dalmau Rodriguez v. Hughes Aircraft Co.*, 781 F.2d 9, 15 (1st Cir.1986) (no stream of commerce established by selling two helicopters sold to company knowing they would be resold in Puerto Rico). The Supreme Court first adopted the stream of commerce theory in *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and then refined it in *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

In *World–Wide Volkswagen*, a family filed a products liability suit in Oklahoma alleging that their injuries from an auto accident there resulted from the defective design of the Audi automobile they purchased from a Volkswagen dealer in New York. *See World–Wide Volkswagen*, 444 U.S. at 288, 100 S.Ct. 559. They sued, among others, the manufacturer, Audi, the importer, Volkswagen, and the regional distributor for New York, New Jersey, and Connecticut, World–Wide. *See id.* at 288–89, 100 S.Ct. 559.

The Court concluded that stream of commerce personal jurisdiction would exist when a defendant could reasonably predict being subject to a lawsuit in the forum state because of its "conduct and connection with the forum state." *See id.* at 297, 100 S.Ct. 559. A defendant can reasonably predict suit in a forum if it " 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

In dicta, the Court stated that an Oklahoma court could exert personal jurisdiction over Audi and Volkswagen, who did not dispute personal jurisdiction:

> If the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

*Id.* at 297–98, 100 S.Ct. 559 (citations omitted). The Court noted that a consumer's unilateral action of transporting the defendant's product into the forum state does not provide a sufficient constitutional basis for exercising personal jurisdiction. *See id.* at 295–96, 100 S.Ct. 559. In the end, the Court found that the regional distributor had insufficient "contacts, ties or relations" with Oklahoma to justify the exercise of personal jurisdiction. *See id.* at 298–99, 100 S.Ct. 559.

In *Asahi*, a four Justice plurality, in an opinion by Justice O'Connor, revisited the stream of commerce theory, holding that due process requires more than just foreseeability that consumers in the forum state will purchase a product; it also requires "an action of the defendant *purposefully directed toward the forum State.*" *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026 (O'Connor, J., plurality opinion) (emphasis in original). Based on these principles, the plurality held that a Japanese manufacturer's knowledge that its valve stem would end up in tires sold by a Taiwanese company in California was in-

sufficient to confer personal jurisdiction in California because:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.*

■ The First Circuit has interpreted *Asahi* and *World–Wide Volkswagen* to require plaintiffs to establish that defendants have purposefully availed themselves of the forum. *See Boit*, 967 F.2d at 682–83 (citing *Dalmau Rodriguez*, 781 F.2d at 15). Mere knowledge that a product would be sold in the jurisdiction is insufficient. *See id.*

In *Dalmau Rodriguez*, Hughes Aircraft Company sold two helicopters to another company, knowing they would end up in Puerto Rico. *See Dalmau Rodriguez*, 781 F.2d at 15. The court held that this knowledge, coupled with a single advertisement in a national magazine not specifically aimed at Puerto Rico, did not spawn a stream of commerce upon which a company would reasonably believe it could be haled into court. *See id.* ("The test is not knowledge of the ultimate destination of the product, but whether the manufacturer has purposefully engaged in forum activities so it can reasonably expect to be haled into court there.").

In *Benitez–Allende*, Alcan/Brasil, a Brazilian company, made 60% of its American pressure cooker sales in Puerto Rico and knew and intended that the cookers be sold in American commerce. *See Benitez–Allende*, 857 F.2d at 29. Alcan/Brasil had initially hired an "export advisor" to meet a Florida resident in Puerto Rico to discuss selling pressure cookers in Puerto Rico. *See id.* The Florida resident later called himself Alcan/Brasil's "sales representative," formed a corporate entity to perform the same tasks, traveled to Puerto Rico four times per year, solicited orders there from wholesalers and distributors, and placed the orders with Alcan/Brasil. *See id.* Alcan/Brasil transferred title to the buyers in Brazil who then paid for shipping the products to Puerto Rico. *See id.* The court concluded that *Asahi* supported exercising personal jurisdiction because of Alcan/Brasil's "deliberate marketing effort" through the "sales representative" and the "export advisor." *See id.* at 30–31. The Court reasoned that passing title to the cookers in Brazil did not detract from the contacts because, "[i]f International Shoe stands for anything, however, it is that a truly interstate business may not shield itself from suit by a careful but formalistic structuring of its business dealings." *Benitez–Allende*, 857 F.2d at 30 (internal quotations omitted).

In *Boit*, a hot air gun caused a house fire in Maine, but because the plaintiff showed no evidence that the gun's manufacturer intended to "serve the market in Maine," only evidence that it sold the gun to a national tool retailer, the court affirmed the district court's decision not to exercise personal jurisdiction based on the stream of commerce theory. *See Boit*, 967 F.2d at 683. The court reasoned that jurisdiction was not proper because the manufacturer did not advertise in Maine, establish customer advice lines for Maine, design the product for Maine, or market the product through a distributor who agreed to act as a sales agent in Maine.

*See id.* (citing *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026).

In *Rodriguez,* a California tire rim manufacturer sold rims to a California tire company, knowing it would offer tires for sale and that it advertised its tires in national publications and brochures distributed to Puerto Rico. *See Rodriguez,* 115 F.3d at 84–85. The First Circuit held that the Puerto Rican plaintiff failed to establish stream of commerce personal jurisdiction because the manufacturer's knowledge that its product would reach Puerto Rico failed to establish purposeful acts directed towards Puerto Rico. *See id.* (citing *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026).

The Court finds particularly instructive the Massachusetts Appeals Court's decision in *Heins v. Wilhelm Loh Wetzlar Optical Machinery GmbH & Co. KG.,* 26 Mass.App.Ct. 14, 522 N.E.2d 989 (1988) *rev. denied,* 402 Mass. 1105, 525 N.E.2d 678 (1988). There, the defendant, a West German optical machine manufacturer, sold its machines to a separate Swiss corporation, who then sold the machines to an Illinois company, who served as the German manufacturer's sole United States distributor. *See id.* at 991–92. The manufacturer had no control over marketing, sales, or prices in the United States, yet the court held that asserting specific personal jurisdiction did not offend the Due Process Clause. *See id.* at 996. The court found that the defendant established minimum contacts to Massachusetts because it not only knew that its machines were sold in Massachusetts, but also that dozens of the machines were located in Massachusetts. *See id.* Moreover, "[w]hile the sales of the defendant's products may have been accomplished indirectly, the defendant also acted directly to serve the Massachusetts market," by not only sending employees to visit Massachusetts companies, provide advice, and cultivate relations, but also by deriving substantial revenue from the sale of its machines in Massachusetts. *See id.*

In this case, Extec had numerous direct contacts with Massachusetts in addition to its indirect benefits and contacts through Rent–A–Screen. Extec began by conducting market research in Massachusetts in the late 1980s to evaluate the potential for selling its machines in the Commonwealth. Extec then began to sell machines to ESI in Massachusetts, using Shredall as its agent. Shredall subsequently created and executed an exclusive dealership agreement with ESI for Massachusetts in 1991. This research and the subsequent sales in Massachusetts by Extec indicates that it not only sought out Massachusetts as a market for its products, but also then actively targeted sales to the Commonwealth through ESI, in essence its dealer in Massachusetts.

Even later, after Shredall changed corporate entities to become Rent–A–Screen, ESI continued to buy Extec machines and sell them into Massachusetts. Even after Rent–A–Screen terminated ESI's exclusive dealership, Rent–A–Screen continued to sell Extec machines to ESI and still does today.

Extec continued to maintain its direct targeting of Massachusetts though ESI by maintaining bills of exchange on the machines it sold ESI between 1993 and 1995. The bills of exchange indicate Extec's availment of Massachusetts contract and property laws, which not only protected Extec from default, but also allowed Extec to obtain the security interest its insurance company required to permit continued sales to ESI in Massachusetts. Two facsimile messages illustrate this connection. The first, on June 10, 1994, between Trade Indemnity and William Coroom, Leeds, noticed the potential termination of insurance coverage if Extec continued to sell to ESI without more security interest. The second, on February 7, 1995, from Extec Director, Nari Saha, to ESI, threatened it with loss of credit if ESI strayed from insurance company credit term mandates. These messages indicate Extec's active targeting of the Massachusetts market and

steps it took to keep the stream of its products flowing into the Commonwealth.

Another factor indicating Extec's intent to serve the forum state's market is Extec's advertising in Massachusetts. *See Asahi*, 480 U.S. at 112, 107 S.Ct. 1026. The distributorship agreement requires Rent–A–Screen to use reasonable commercial efforts to market Extec's machines in the whole sales territory, including Massachusetts. In other words, Extec, through the distributorship agreement, required Rent–A–Screen to advertise Extec machines in Massachusetts. Extec designed and printed advertisements in England for distribution across the United States by Rent–A–Screen. The brochures that Extec required Rent–A–Screen to distribute depict Extec machines, and give direct contact numbers to Extec in England, as well as Rent–A–Screen and Extec of Germany. Rent–A–Screen distributed the brochures to ESI in Massachusetts, which displays them for its customers. Consequently, while Rent–A–Screen may be a secondary beneficiary of the advertisement, the brochure's primary purpose is to boost the sale of Extec machines in the United States, including Massachusetts. In addition, each Extec machine displays prominent Extec markings and sticker designs in addition to stickers indicating Rent–A–Screen's toll-free telephone number. The Extec and ESI web sites depict only Extec machines.

Moreover, though the agreement allowed Extec to remove any geographic portion from the territory, no evidence before the Court indicates that Extec removed Massachusetts from Rent–A–Screen's territory or actively attempted to prevent its machines from being sold in the Commonwealth. *See World–Wide Volkswagen*, 444 U.S. at 297;, 100 S.Ct. 559 *see also Oswalt v. Scripto*, 616 F.2d 191, 199 (5th Cir.1980) (relying on *World–Wide Volkswagen* to suggest that failure to prevent distribution into Texas supported finding minimum contacts there).

The Court finds unpersuasive Extec's argument that it had no control over where Rent–A–Screen advertised. Here, the manufacturer required its distributor to advertise its products in Massachusetts. This scenario is distinguished from *Rodriguez*, where the tire manufacturer incorporated the defendant's rims into its tires, then advertised the tires, not the defendant's rims. *See Rodriguez*, 115 F.3d at 84–85. Extec's requiring Rent–A–Screen to advertise in Massachusetts, regardless of the requirement to advertise in the rest of its sales territory, is strong evidence that Extec targeted Massachusetts. Further, the number of Extec machines sold in Massachusetts and the substantial revenue that Extec generated through sales in the Massachusetts market, both directly and indirectly through Rent–A–Screen, indicate that Extec not only targeted Massachusetts, but hit that target. *See Heins*, 522 N.E.2d at 996 (citing *World–Wide Volkswagen*, 444 U.S. at 299, 100 S.Ct. 559).

Not only did Extec's advertisements provide a direct telephone number to its offices in England, but a national toll-free telephone number as well, which connected to Rent–A–Screen and allowed it to dispense advice and the location of the nearest American dealer of Extec machines. Because Extec's distributorship agreement required Rent–A–Screen to distribute the brochures with both of these telephone numbers throughout the United States, including Massachusetts, and Extec served as its ultimate benefactor, even if Rent–A–Screen actually provided the advice, Extec "establish[ed] channels for providing regular advice to customers in the forum State." *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026.

Additional evidence that Extec intentionally targeted the Massachusetts market comes from its maintenance of nationwide products liability insurance, that covered Massachusetts. *See World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559. Extec's insurance coverage indicates

not only that it anticipated its products reaching Massachusetts, but also being haled into litigation arising from its products' presence in Massachusetts. *See Asahi*, 480 U.S. at 110, 107 S.Ct. 1026.

Considering this evidence as a whole, the Court concludes that Extec not only knew that its products would end up in Massachusetts through the stream of commerce, but that it also acted to target the market in Massachusetts. *See Asahi*, 480 U.S. at 112, 107 S.Ct. 1026. Extec targeted Massachusetts by establishing a distributor relationship with Rent–A–Screen, which agreed to exercise its best efforts to sell Extec products in Massachusetts. *See id.* Extec also specifically enabled Rent–A–Screen's sales in Massachusetts by using bills of exchange, which relied upon the protection of Massachusetts property and contract law. *See Hanson*, 357 U.S. at 253, 78 S.Ct. 1228 (benefitting from state laws' protection suggests personal jurisdiction in that state when sued). In addition, Extec advertised in Massachusetts, and established channels for advising consumers in Massachusetts. *See Asahi*, 480 U.S. at 112, 107 S.Ct. 1026. As a result, the Court concludes that Extec's active steps to ensure the long-term flow of products into Massachusetts resembles the targeted sale of pressure cookers into Puerto Rico in *Benitez–Allende* and differs from the "isolated splash" of the two helicopters sold into Puerto Rico in *Dalmau Rodriguez*. *See Benitez–Allende*, 857 F.2d at 29–31; *Dalmau Rodriguez*, 781 F.2d at 15. The evidence that the Bartows have produced

establishes that Extec directly and indirectly targeted Massachusetts and " 'purposefully engaged in activities in Massachusetts so it can reasonably anticipate being haled into court [here].' " *Boit*, 967 F.2d at 682 (quoting *Hughes*, 781 F.2d at 15).

■ In sum, the Court concludes that because Extec not only knew that its machines ended up in Massachusetts, but also specifically targeted and facilitated sales to and through Massachusetts, Extec anticipated suit in Massachusetts. *See Asahi*, 480 U.S. at 112, 107 S.Ct. 1026; *Boit*, 967 F.2d at 682–83. As a result, the Court concludes that Extec established sufficient minimum contacts to Massachusetts. *See Asahi*, 480 U.S. at 112, 107 S.Ct. 1026; *World–Wide Volkswagen*, 444 U.S. at 297–98, 100 S.Ct. 559.[2]

### 2. *Fair Play and Substantial Justice*

■ As the Court concludes that the foreign defendant established minimum contacts to the forum, the Court must evaluate the fairness of subjecting the nonresident to the Court's power. *See Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 717 (1st Cir.1996). The five "gestalt factors" the Court considers are:

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution in the controversy, and (5)

**2.** The Court finds misplaced Extec's argument that the Court lacks specific jurisdiction because Bartow's employer purchased the machine in Pennsylvania and had it shipped to Connecticut. So long as the defendant has sufficient minimum contacts with the forum jurisdiction, it is irrelevant that the individual product causing the injury was purchased in another state. *See World–Wide Volkswagen*, 444 U.S. at 297–99, 100 S.Ct. 559 (noting in dicta undisputed personal jurisdiction over foreign manufacturer and importer in state of injury despite product purchase in another state); *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1537, 1550 (11th Cir.1993) (per-

sonal jurisdiction over foreign manufacturer in state of accident despite purchase in another state); *Giotis v. Apollo of the Ozarks*, 800 F.2d 660, 668 (7th Cir.) (personal jurisdiction where product bought outside forum because forum state within scope of sales efforts), *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1303, 94 L.Ed.2d 158 (1987). The Court notes that any First Circuit disfavoring of *Giotis* in *Boit* only applies to the holding that knowledge is sufficient to establish minimum contacts, not to the holding cited here; if plaintiff shows contacts to the forum, then jurisdiction is appropriate, despite the product's purchase in another state. *See Boit*, 967 F.2d at 681–82.

the common interests of all sovereigns in promoting substantive social policies. *United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1089 (1st Cir.1992). Evaluating these factors aids the Court to achieve substantial justice. *See Nowak*, 94 F.3d at 717.

### a. *Extec's Burden*

 Because suit in a foreign jurisdiction always burdens a foreign company, the defendant must establish that the Court's exercise of jurisdiction would be " 'onerous in a special, unusual, or other constitutionally significant way.' " *Id.* at 718 (quoting *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir.), *cert. denied*, 514 U.S. 1108, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995)). Extec's claim of burden by appearing in Massachusetts, because Rent–A–Screen is located in Pennsylvania, simply fails to qualify as a burden of constitutional significance. *See id.* As a result, this factor tips in favor of Extec, yet the Court attaches no special significance to this factor. *See id.*

### b. *Forum's Interest*

The Commonwealth of Massachusetts has a legitimate interest in adjudicating the suit because it involves an injury suffered within the state by a resident of Massachusetts. *See Benitez–Allende*, 857 F.2d at 31 (forum's interest in protecting its citizens from defective products weighs heavily in favor of jurisdiction); *Nowak*, 94 F.3d at 718 (finding strong interest in Massachusetts despite injury in Hong Kong).

### c. *Plaintiffs' Interest*

The Court accords deference to the Bartows' choice of filing suit in a Massachusetts forum. *See Nowak*, 94 F.3d at 718. As the defendant concedes, this factor favors jurisdiction in Massachusetts due to greater convenience for the plaintiffs. Moreover, the injury occurred in Massachusetts, most of plaintiffs' witnesses are in Massachusetts, as well as the allegedly defective machine.

### d. *Administration of Justice*

Generally this factor is a wash, unless the Court perceives the threat of piecemeal litigation. *Id.* at 718–19. The parties have not indicated any chance of piecemeal litigation in this case and, consequently, the Court does not consider this factor in either party's favor.

### e. *Policy Considerations*

The last gestalt factor the Court considers incorporates the substantive social policies of the affected governments. *See id.* at 719. Here, Massachusetts has an interest in protecting its citizens from out-of-state manufacturers of defective products and providing its citizens with a convenient forum to adjudicate their complaints, especially when the injury occurred in Massachusetts. *See id.* The Court also considers that Massachusetts has a policy interest in providing foreign manufacturers, like Extec, the incentive of liability to ensure their reasonable care in manufacturing products destined for the state. Moreover, Massachusetts has an interest in preventing these same manufacturers from avoiding personal jurisdiction, limiting injured parties' recovery, and in essence blocking their own liability, by establishing independent distributorships like Rent–A–Screen then precluding them from obtaining products liability insurance. The Court can adduce only a single policy interest on behalf of England in this case—protecting its businesses—yet it pales in comparison to the Massachusetts interests of protecting its citizens from defective products and personal injury. Consequently, the Court concludes that this factor tips in favor of personal jurisdiction in Massachusetts.

Accordingly, the Court concludes that the "gestalt factors" heavily favor a proceeding in a Massachusetts forum. *See Nowak*, 94 F.3d at 719 (personal jurisdiction over Hong Kong hotel in Massachu-

setts despite injury in Hong Kong); *Benitez–Allende*, 857 F.2d at 30–31 (balances in product liability case favored personal jurisdiction over Brazilian manufacturer in Puerto Rico). In combination with the Bartows' satisfaction of the Massachusetts long-arm statute and Extec's constitutionally sufficient contacts with Massachusetts, the Court concludes that personal jurisdiction in Massachusetts over Extec is "reasonable and does not offend the notions of fair play and substantial justice." *Nowak*, 94 F.3d at 719. As a result, the Court concludes that it will exercise personal jurisdiction over Extec.

### C. *Motion to Compel*

The Bartows have submitted a motion to compel Extec to pay their deposition expenses of $4,205.74. Extec paid $1,119.78, and refuses to pay any more, complaining that the Bartows sent too many attorneys and that they overstayed their welcome. After reviewing the receipts, the Court concludes that although the Bartows did send two attorneys where they only needed one, Extec's payments do not suffice to cover that one attorney's expenses. Combining Attorney Gable's trip expenses with the price increase of the deposition because Extec required it be held in England, the Court finds that the Bartows' recoverable deposition expenses totaled $2,000.00. As a result, Extec owes the Bartows an additional $880.22 for deposition expenses.

### IV. CONCLUSION

For the foregoing reasons, the Court DENIES defendant Extec's motion to dismiss for lack of personal jurisdiction.[3] The Court also orders Extec pay an additional $880.22 in deposition expenses, for a total of $2,000.00.

It is So Ordered.

---

**3.** The Court does not address the Bartows' motion to transfer or motions to strike as the denial of the motion to dismiss renders these issues moot.