Merrimack
No. 2009-545

THE STATE OF NEW HAMPSHIRE

v.

NORTH ATLANTIC REFINING LIMITED *& a.*

Argued: March 31, 2010
Opinion Issued: May 7, 2010

*Michael A. Delaney*, attorney general (*Mary Maloney*, assistant attorney general, on the brief), *Sher Leff, LLP*, of San Francisco, California (*Victor M. Sher* on the brief), and *Law Offices of Matthew F. Pawa, P.C.*, of Newton Centre, Massachusetts (*Matthew F. Pawa* and *Benjamin A. Krass* on the brief, and *Mr. Pawa* orally), for the State.

*Nixon Peabody LLP*, of Manchester (*W. Scott O'Connell* and *Holly Kilibarda* on the brief, and *Mr. O'Connell* orally), and *Sutherland Asbill & Brennan*, of New York, New York (*David P. Langlois* on the brief), for North Atlantic Refining Limited.

DALIANIS, J. North Atlantic Refining Limited (North Atlantic) appeals an order of the Superior Court (*Fauver*, J.) denying its motion to dismiss for lack of personal jurisdiction. We affirm.

## I. Background

This is the latest appeal stemming from the State's 2003 lawsuit against refiners and manufacturers that allegedly supplied New Hampshire with

gasoline containing methyl tertiary butyl ether, commonly referred to as "MTBE," to recover damages purportedly caused by contamination of groundwater and surface waters in the state. *See State v. Hess Corp.*, 159 N.H. 256, 258 (2009); *State v. City of Dover*, 153 N.H. 181, 184 (2006).

MTBE is a synthetic organic compound known as an oxygenate. It was first added to gasoline in the late 1970's. *City of Dover*, 153 N.H. at 183. Manufacturers of MTBE claim that its addition to gasoline boosts octane levels and produces a cleaner burning fuel, which is less likely to produce airborne pollutants. *Id.*

In 1990, Congress established the "reformulated gasoline program" to reduce vehicle-related air pollution. *See* 42 U.S.C. § 7545(k) (2006). This program set specifications for gasoline sold in certain metropolitan areas with high smog levels. The program did not require gasoline manufacturers to use MTBE or any other specific oxygenate in reformulating gasoline, but rather allowed individual refiners to decide which oxygenate to use. New Hampshire participated in the reformulated gas program in four counties, effective January 1, 1995. Between 1995 and 2006, gasoline with MTBE was sold throughout the state. During this time, the State alleges that MTBE escaped into and contaminated groundwater. Effective January 1, 2007, New Hampshire banned MTBE as a gasoline additive.

North Atlantic, one of the named defendants in the State's lawsuit, owns and operates an oil refinery in Come-by-Chance in the Province of Newfoundland and Labrador, Canada. From 1994 until October 2006, North Atlantic was part of the international Vitol group of companies. From 1994 until July 1995, North Atlantic was owned by Vitol Holdings B.V. In July 1995, Vitol Holdings B.V. transferred ownership of North Atlantic to a separate wholly owned subsidiary, Vitol Refining Group B.V. In October 2006, Vitol Refining Group B.V. sold North Atlantic to Harvest Energy Trust.

North Atlantic describes itself as a "tolling refinery," which it defines as a refinery that "offers only the services of refining. All of the components of the products refined belong to the customer throughout the process. The refiner has no legal title to the feedstocks refined or to the finished product." Feedstocks are raw petroleum materials, such as crude oil.

From February 1995 until March 2006, North Atlantic produced reformulated gas containing MTBE. When North Atlantic first began producing reformulated gas containing MTBE, its exclusive customer was another Vitol company, Vitol S.A., Inc., a co-defendant in this case. Beginning in August 1995 and continuing until October 2006, North Atlantic's exclusive customer for MTBE gasoline was yet another Vitol company, Vitol Refining S.A. (Vitol Refining). Vitol Refining is a Swiss subsidiary of Vitol Refining Group B.V. Accordingly, for the times relevant to this appeal, North

Atlantic and its exclusive customers were all subsidiaries of Vitol Refining Group B.V., and, thus, sister companies. Vitol Refining distributed its gasoline to United States locations, including New Hampshire, through Vitol S.A., Inc.

Pursuant to the processing agreement between North Atlantic and Vitol Refining, North Atlantic took custody of certain feedstocks from Vitol Refining. Vitol Refining and North Atlantic then would "enter into a mutually acceptable processing confirmation" with respect to each delivery. North Atlantic would blend the feedstocks in accordance with the parties' agreement and the applicable processing confirmation into finished petroleum products, including reformulated gasoline containing MTBE. North Atlantic was the importer of record for the feedstocks received, and the exporter of record for the petroleum products produced. Vitol Refining was the sole owner, however, of the feedstocks and the finished petroleum products.

The State alleges that North Atlantic, as a refiner of gasoline containing MTBE: (1) designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) gasoline containing MTBE that was delivered into the state; and (2) participated in one or more enterprises to promote MTBE and/or gasoline containing it, even though reasonable alternatives were available and even though North Atlantic knew or should have known that MTBE would pollute the State's groundwater and surface waters.

In November 2007, North Atlantic moved to dismiss the State's complaint against it for lack of personal jurisdiction. In July 2008, the trial court allowed the parties to conduct discovery on the jurisdictional issue. Among the facts revealed as a result of this discovery were the following. North Atlantic has no employees, offices, property, bank accounts or assets in New Hampshire, and is not registered or qualified to conduct business in any United States jurisdiction. North Atlantic has never advertised or solicited sales in New Hampshire, and, since 1994, has not sold gasoline or any other products in New Hampshire. However, thirty-seven shipments of reformulated gas containing MTBE were sent from North Atlantic's refinery to a New Hampshire location. Vitol Refining was listed as the importer for twenty-two of these shipments.

Discovery also revealed that North Atlantic understood that the primary market for the MTBE gasoline it produced was the northeastern United States. North Atlantic knew that the reformulated gas it produced "had to meet a specification mandated by the [Federal Environmental Protection Agency]," and, accordingly, North Atlantic agreed to meet that specification. North Atlantic operated a laboratory at the refinery to test the finished MTBE gasoline to ensure that these specifications were met.

Additionally, North Atlantic informed an entity known as Environment Canada that ninety percent of the MTBE gas it produced was destined for the United States.

North Atlantic understood as well that there was an economic advantage to producing reformulated gas containing MTBE. In its response to Environment Canada, North Atlantic stated that "[r]eplacing the oxygen content with an alternative oxygenate [to MTBE] would result in an incremental increase in production cost. Removing oxygen from the gasoline altogether and making conventional gasoline is incrementally cheaper, but the loss of the [reformulated gas] market would result in a net economic loss." North Atlantic further informed Environment Canada that there were "no economically viable alternatives" to MTBE.

Further, pursuant to a 2001 notice from Environment Canada, North Atlantic had information that there was "a growing concern in the United States that spills and leaks of MTBE and gasoline containing MTBE are contaminating groundwater and drinking water," and that, as a result of this concern, "[a] number of states" planned to "ban the use of MTBE in gasoline starting in 2003 to 2004." Despite this knowledge, North Atlantic continued to produce gasoline containing MTBE until March 2006.

In July 2009, the trial court denied North Atlantic's motion to dismiss on the ground that the State had offered a *prima facie* showing of facts to justify exercise of specific personal jurisdiction over North Atlantic. This appeal followed.

## II. Standard of Review

When evaluating a defendant's motion to dismiss for lack of personal jurisdiction, the standard of review varies according to the procedural posture of the case. *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 674-78 (1st Cir. 1992); *see* 5B C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL § 1351, at 274 (3d ed. 2004). When, as in this case, the trial court rules upon the motion without holding an evidentiary hearing, the trial court applies a *"prima facie"* standard, and we review the trial court's decision *de novo. United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001); *see D'Jamoos v. Atlas Aircraft Center, Inc.*, 669 F. Supp. 2d 167, 169-70, 172 (D.N.H. 2009) (applying *prima facie* standard after having granted plaintiff jurisdictional discovery); *Vt. Wholesale Bldg. Prods. v. J.W. Jones Lumber Co.*, 154 N.H. 625, 628 (2006); WRIGHT & MILLER, *supra* at 275, 286-88.

Under the *prima facie* standard, the inquiry is whether the plaintiff (here, the State) "has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *Phillips v.*

*Prairie Eye Center*, 530 F.3d 22, 26 (1st Cir. 2008), *cert. denied*, 129 S. Ct. 999 (2009). To make a *prima facie* showing, the plaintiff "ordinarily cannot rest upon the pleadings, but is obliged to adduce evidence of specific facts." *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995); *see Thomas v. Telegraph Publ'g Co.*, 151 N.H. 435, 437 (2004). The trial court's role, and our role in our *de novo* review, is "not as a factfinder, but as a data collector. That is to say, the court . . . must accept the plaintiff's (properly documented) proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." *Foster-Miller*, 46 F.3d at 145 (citation omitted). Additionally, the court must construe the plaintiff's evidentiary proffers "in the light most congenial to the plaintiff's jurisdictional claim." *Phillips*, 530 F.3d at 26 (quotation omitted). Facts put forward by the defendant may be considered only if they are uncontradicted by the plaintiff's submissions. *Mass. School of Law at Andover v. American Bar*, 142 F.3d 26, 34 (1st Cir. 1998).

## III. Analysis

To determine whether the State has met its burden, we examine whether our long-arm statute authorizes such jurisdiction, and whether the requirements of the Federal Due Process Clause are satisfied. *See Vt. Wholesale*, 154 N.H. at 628. As a practical matter, because we construe the long-arm statute as permitting the exercise of jurisdiction to the extent permissible under the Federal Due Process Clause, our primary analysis relates to due process. *Id.*; *see Daynard v. Ness, Motley, Loadholt, Etc.*, 290 F.3d 42, 52 (1st Cir.) (when a state's long-arm statute is coextensive with the outer limits of due process, the court's attention properly turns to the federal constitutional standards), *cert. denied*, 537 U.S. 1029 (2002).

Pursuant to the Federal Due Process Clause, a court may exercise personal jurisdiction over a nonresident defendant if the defendant has minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Vt. Wholesale*, 154 N.H. at 628. Personal jurisdiction can either be general or specific. *Id.* "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *Id.* (quotation and brackets omitted); *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994) (quotation omitted), *cert. denied*, 514 U.S. 1108 (1995). Specific jurisdiction is narrower in scope and exists "where the cause of action arises out of or relates to the defendant's forum-based contacts." *Vt. Wholesale*, 154 N.H. at 628 (quotation omitted). Only specific jurisdiction is at issue here.

■ To decide whether the exercise of specific personal jurisdiction comports with due process, we examine whether: (1) the contacts relate to the cause of action; (2) the defendant has purposefully availed itself of the protection of New Hampshire's laws; and (3) it would be fair and reasonable to require the defendant to defend the suit in New Hampshire. *Id.* All three factors must be satisfied in order for the exercise of jurisdiction to be constitutional, and each factor must be evaluated on a case-by-case basis. *Id.* at 629.

Because the State has not argued otherwise, we assume, without deciding, that there is no basis for examining North Atlantic's minimum contacts with New Hampshire collectively with those of the other Vitol entities involved in the manufacture, distribution and sale of MTBE gasoline to New Hampshire consumers. *See Tom's of Maine v. Acme-Hardesty Co.*, 565 F. Supp. 2d 171, 180-83 (D. Me. 2008) (court will examine minimum contacts of related companies collectively when presumption of corporate separateness is overcome). We limit our analysis accordingly.

### A. Relatedness of Contacts to Claims

■ We begin by examining the first factor, whether North Atlantic's contacts relate to the State's cause of action. This factor involves whether the claim underlying the litigation directly arises out of or relates to the defendant's forum-state activities. *Astro-Med, Inc. v. Nihon Kohden America, Inc.*, 591 F.3d 1, 9 (1st Cir. 2009). The relatedness test is a "flexible, relaxed standard." *Id.* (quotations omitted). To satisfy the relatedness factor, "[t]here must be more than just an attenuated connection between the contacts and the claim; the defendant's in-state conduct must form an important, or at least material, element of proof in the plaintiff's case." *Phillips*, 530 F.3d at 27 (quotation and brackets omitted). The court's assessment of relatedness "is informed by the concept of foreseeability." *Unicomp, Inc. v. Harcros Pigments, Inc.*, 994 F. Supp. 24, 25 (D. Me. 1998). In *Unicomp*, for instance, the court determined that the alleged injury from the sale of a product in the forum state by the manufacturer through its chosen distributor was "sufficiently foreseeable to satisfy the relatedness prong of the jurisdictional inquiry." *Id.* at 25-26.

In this case, the State has asserted five causes of action: strict product liability based upon defective design, strict product liability based upon failure to warn, trespass, negligence and violation of the New Hampshire Consumer Protection Act, *see* RSA ch. 358-A. A sixth cause of action, public nuisance, was previously dismissed. All of these claims stem, at least in part, from the State's assertion that refineries, such as North Atlantic's,

supplied MTBE gasoline, either directly or indirectly, to New Hampshire consumers, and, as a result, MTBE escaped into and contaminated New Hampshire waters.

While North Atlantic argues that it had no contacts with New Hampshire, *see Swiss American Bank*, 274 F.3d at 621 (noting that "there can be no requisite nexus between the [defendant's] contacts and the [plaintiff's] cause of action if no contacts exist"), the State has submitted properly documented proffers that, if credited, demonstrate that such contacts exist. North Atlantic's contacts with New Hampshire include producing and designing reformulated gas containing MTBE for the northeastern United States market (which, necessarily, includes New Hampshire), as well as the presence of thirty-seven shipments of such gas at a New Hampshire location. We conclude that, based upon these properly documented proffers, which we must credit, the State's causes of action arise from or relate to the shipments of MTBE gasoline produced at North Atlantic's refinery and supplied to a New Hampshire location. North Atlantic's contacts, therefore, relate to the State's claims. *See McNair v. McNair*, 151 N.H. 343, 350 (2004) (when the alleged minimum contacts are the same acts upon which the plaintiff's cause of action is based, the minimum contacts relate to the cause of action). The alleged injury from the shipment of MTBE gas to a New Hampshire location by North Atlantic's exclusive customer, its sister company, Vitol Refining, was "sufficiently foreseeable to satisfy the relatedness prong of the jurisdictional inquiry." *Unicomp*, 994 F. Supp. at 26.

Relying upon an earlier trial court order regarding another defendant, North Atlantic argues that the "law of the case" requires a different result. North Atlantic's reliance upon this doctrine is misplaced. Under the "law of the case" doctrine, when an appellate court states a rule of law, it is conclusively established and determinative of the rights of the same parties in any subsequent appeal or retrial of the same case. *Merrimack Valley Wood Prods. v. Near*, 152 N.H. 192, 201 (2005). The question decided in the first appeal is known as the law of the case, and becomes binding precedent to be followed in successive stages of the same litigation. *Id.* As we have not previously stated any rule of law regarding whether New Hampshire has personal jurisdiction over any of the defendants in this case, including North Atlantic, the law of the case doctrine does not apply. *See id.* at 202.

*B. Purposeful Availment*

"To satisfy the second requirement, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protection of that state's laws and making the defendant's involuntary presence before

the state's courts foreseeable." *Astro-Med*, 591 F.3d at 10 (quotation omitted). This factor "assure[s] that personal jurisdiction is not premised solely upon a defendant's random, isolated, or fortuitous contacts with the forum state." *D'Jamoos*, 669 F. Supp. 2d at 172 (quotations omitted). Purposeful availment requires both foreseeability and voluntariness. *Thomas*, 151 N.H. at 438. "Voluntariness requires that the defendant's contacts with the forum state proximately result from actions by the defendant *himself.*" *Phillips*, 530 F.3d at 28 (quotation omitted); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). "The contacts must be deliberate, and not based on the unilateral actions of another party." *Phillips*, 530 F.3d at 28 (quotation omitted). "Foreseeability requires that the contacts also must be of a nature that the defendant could reasonably anticipate being haled into court there." *Id.* (quotation omitted); *see World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

■ When evaluating the purposeful availment factor in the context of a products liability case, we employ the "stream of commerce plus" theory first articulated by Justice O'Connor in her plurality opinion in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 108-13 (1987). *See Vt. Wholesale*, 154 N.H. at 635-36 (adopting Justice O'Connor's plurality opinion); *Boit*, 967 F.2d at 682-83 (same). In her plurality opinion, Justice O'Connor opined that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi*, 480 U.S. at 112 (O'Connor, J., plurality opinion). Nor is the defendant's "awareness that the stream of commerce may or will sweep the product into the forum State" sufficient to establish purposeful availment. *Id.* (O'Connor, J., plurality opinion); *see Vt. Wholesale*, 154 N.H. at 636 (holding that the fact that the defendant could foresee that its product would likely reach New Hampshire is insufficient to establish that the defendant purposefully availed itself of the protection of New Hampshire's laws).

Rather, to meet the purposeful availment factor, there must be "[a]dditional conduct of the defendant" that "indicate[s] an intent or purpose to serve the market in the forum State." *Asahi*, 480 U.S. at 112 (O'Connor, J., plurality opinion). Such conduct could include "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* (O'Connor, J., plurality opinion).

■ Here, the State has met its burden of establishing a *prima facie* case that North Atlantic purposefully availed itself of the protection of New Hampshire's laws. The State has submitted evidence, which we must accept

as true, that it was foreseeable to North Atlantic that its MTBE gas would likely reach New Hampshire. North Atlantic knew that the primary market for MTBE gas was the northeastern United States, which necessarily includes New Hampshire. *See Tobin v. Astra Pharmaceutical Products, Inc.*, 993 F.2d 528, 544 (6th Cir.) (holding that company purposefully availed itself of privilege of conducting business in all states when it licensed another company to distribute its drug in all fifty states and rejecting argument that defendant did nothing in particular to purposefully avail itself of the Kentucky market as distinguished from any other state), *cert. denied*, 510 U.S. 914 (1993).

Additionally, the State has submitted evidence, which we must accept as true, that North Atlantic did more than merely place its product in the stream of commerce. In this case, the "plus" required by the "stream of commerce plus" theory is that North Atlantic specifically produced and designed reformulated gas containing MTBE for the northeastern United States market (which includes New Hampshire). *See In re Perrier Bottled Water Litigation*, 754 F. Supp. 264, 265, 268 (D. Conn. 1990) (Pennsylvania and Connecticut had personal jurisdiction over French corporation that designed containers of Perrier water specifically for the United States market, "which, of course, includes Pennsylvania, and Connecticut"). The MTBE gasoline North Atlantic produced was blended according to a protocol to which North Atlantic specifically agreed with its *sole* MTBE gasoline customer, its sister company, Vitol Refining. North Atlantic agreed to meet the specifications of Vitol Refining, and operated a laboratory at the refinery to test the finished MTBE gasoline to ensure that these specifications were met. While Vitol Refining owned the MTBE gasoline, and Vitol S.A., Inc., distributed it to United States customers, North Atlantic was the exporter of record for all MTBE gasoline shipments. North Atlantic was an integral and voluntary part of this distribution system. *See Clune v. Alimak AB*, 233 F.3d 538, 544 (8th Cir. 2000) (rejecting defendant's argument that it was unaware of what happened to its products after they left Swedish port), *cert. denied*, 533 U.S. 929 (2001). Further, North Atlantic realized economic advantages from producing MTBE gasoline for the northeastern United States market. We hold that these contacts are sufficient to satisfy the "plus" component of the "stream of commerce plus" theory.

*C. Fairness and Reasonableness*

■ We now evaluate the final factor, whether it is fair to subject North Atlantic to suit here. We look to the five "gestalt factors," which consider: (1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the

most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Vt. Wholesale*, 154 N.H. at 629. The "gestalt factors" sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. *Id.*

### 1. North Atlantic's Burden (Factor One)

■■■ "Because suit in a foreign jurisdiction always burdens a foreign company, the defendant must establish that the Court's exercise of jurisdiction would be onerous in a special, unusual, or other constitutionally significant way." *Bartow v. Extec Screens and Crushers, Ltd.*, 53 F. Supp. 2d 518, 528 (D. Mass. 1999) (quotations omitted); *see Pritzker*, 42 F.3d at 64. Although the United States Supreme Court has warned that the burden of mounting a defense in a foreign legal system is "unique" and should be afforded "significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders," *Asahi*, 480 U.S. at 114, "we think that a Canadian defendant such as [North Atlantic] bears a substantially lighter burden than do[] . . . most other foreign defendants." *Aristech Chm. Intern. v. Acrylic Fabricators*, 138 F.3d 624, 628-29 (6th Cir. 1998) (citing cases). In recent years, United States courts have similarly concluded and have "routinely require[d] Canadian companies to defend here." Parrish, *Trail Smelter Déjà Vu: Extraterritoriality, International Environmental Law, and the Search for Solutions to Canadian-U.S. Transboundary Water Pollution Disputes*, 85 B.U. L. REV. 363, 390-91 (2005).

Companies, like North Atlantic, that do business close to the border and to the court where the case is pending, "have the lightest burden." *Id.* at 391; *see Aristech*, 138 F.3d at 628-29; *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 631-32 (11th Cir. 1996); *Glinka v. Abraham and Rose Co. Ltd.*, 199 B.R. 484, 497 (D. Vt. 1996) ("The burden in this case on the defendant to defend in [Vermont] . . . is slight; its offices in Montreal are not particularly distant."), *aff'd on other grounds by In re Housecraft Industries USA, Inc.*, 310 F.3d 64 (2d Cir. 2002); *Ensign-Bickford Co. v. ICI Explosives USA Inc.*, 817 F. Supp. 1018, 1031 (D. Conn. 1993) (emphasizing the "relatively short distance from the defendant's principal place of business in Ontario, Canada, to the site of this litigation in Connecticut").

In addition, a Canadian defendant litigating in the United States finds a judicial system "rooted in the same common law traditions" as that of Canada. *Theunissen v. Matthews*, 935 F.2d 1454, 1462 (6th Cir. 1991); *see Ensign-Bickford*, 817 F. Supp. at 1031 ("[T]he unfairness of forcing a foreign party to litigate in an unfamiliar legal system is alleviated here by the fact that the Canadian legal system is similar in many respects to the

legal system in the United States."). In sum, then, the exercise of personal jurisdiction does not impose a heavy burden upon North Atlantic.

### 2. Interest of State (Factors Two and Three)

The State of New Hampshire has a legitimate interest in adjudicating this suit because it involves the claimed contamination and pollution of State waters. *Cf. Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 31 (1st Cir. 1988) (forum's interest in protecting its citizens from defective products weighs heavily in favor of jurisdiction), *cert. denied*, 489 U.S. 1018 (1989). North Atlantic acknowledges that the State of New Hampshire "has an interest in adjudicating this dispute," particularly given that the State is the plaintiff. For similar reasons, we accord deference to the State's choice of filing suit in New Hampshire. *See Bartow*, 53 F. Supp. 2d at 528.

### 3. Administration of Justice (Factor Four)

"Generally this factor is a wash, unless the Court perceives the threat of piecemeal litigation." *Id*. As the parties have not indicated that there is a risk of piecemeal litigation in this case, we do not consider this factor in our analysis. *See id.*

### 4. Policy Considerations (Factor Five)

This last gestalt factor involves "the substantive social policies of the affected governments." *Id*. New Hampshire has an interest in protecting its citizens from the contamination of State waters by MTBE gasoline, and in providing the State with a convenient forum to adjudicate its complaints. *See id.* We also consider that New Hampshire has a policy interest in providing foreign refineries, such as North Atlantic, "the incentive of liability to ensure their reasonable care" in producing and designing gasoline for distribution in the state. *Id*. Moreover, New Hampshire has an interest in preventing these same refineries "from avoiding personal jurisdiction, limiting injured parties' recovery, and in essence blocking their own liability," by producing their products exclusively for one related corporate entity and distributing them through another related entity. *Id*. While Canada has a policy interest in protecting its businesses from liability, New Hampshire's interests are weightier. *See id.* Consequently, this factor tips in favor of personal jurisdiction in New Hampshire. *See id.* After considering the "gestalt factors," we conclude that it is fair and reasonable to require North Atlantic to defend suit in New Hampshire.

For all of the above reasons, therefore, we hold that North Atlantic is subject to specific personal jurisdiction in New Hampshire.

*Affirmed.*

BRODERICK, C.J., and DUGGAN and HICKS, JJ., concurred.